```
1            IN THE UNITED STATES DISTRICT COURT

2               FOR THE DISTRICT OF OREGON

3   UNITED STATES OF AMERICA,        )
                                     )
4                  Plaintiff,        ) No. 6:11-cr-60097-HO
                                     )
5     v.                             ) June 5, 2012
                                     )
6   CODY SETH CRAWFORD,              ) Eugene, Oregon
                                     )
7                  Defendant.        )

8


9          TRANSCRIPT OF DETENTION PROCEEDINGS

10      BEFORE THE HONORABLE THOMAS M. COFFIN

11   UNITED STATES DISTRICT COURT MAGISTRATE JUDGE

12          A.M. SESSION - PAGES 1 THROUGH 45

13                       -:-

14            APPEARANCES OF COUNSEL

15   FOR THE PLAINTIFF:     FARA T. GOLD, via telephone
                            U.S. Department of Justice
16                          Civil Rights Division
                            Criminal Section
17                          601 D Street
                            P.O. Box 5200
18                          Washington, D.C.  20530
                            (202) 305-1896
19


20   FOR THE DEFENDANT:     BRYAN E. LESSLEY
                            Federal Public Defender's Office
21                          859 Willamette Street
                            Suite 200
22                          Eugene, OR  97401
                            (541) 465-6937
23


24   COURT REPORTER:        Deborah Wilhelm, CSR, RPR
                            P.O. Box 1504
25                          Eugene, OR  97440
                            (541) 431-4113
```

INDEX OF EXAMINATIONS

| FOR THE DEFENDANT: | Direct | Cross | ReD | ReX |
|---|---|---|---|---|
| GARY MESIBOV | | | | |
| By Mr. Lessley | 4 | -- | -- | -- |
| By Ms. Gold | -- | 30 | -- | -- |

```
 1              (Tuesday, June 5, 2012; 11:07 a.m.)
 2                    P R O C E E D I N G S
 3         THE CLERK:  Now is the time set for Case Number
 4    11-60097, United States of America versus Cody Seth
 5    Crawford for continuation of oral argument on the sealed
 6    motion.
 7         Dr. Mesibov and Mr. Wanly are by telephone, as
 8    is Ms. Gold.
 9         THE COURT:  Okay.  All right.  Dr. Mesibov, can
10    you hear me?  This is Judge Coffin.
11         DR. MESIBOV:  Yes, sir.
12         THE COURT:  And Ms. Gold?
13         MS. GOLD:  Yes, Your Honor.
14         THE COURT:  And Mr. Wanly?
15         MR. WANLY:  Yes, sir.
16         THE COURT:  All right.  So are you going to ask
17    Dr. Mesibov any questions, Mr. Lessley, or just open
18    this up for Ms. Gold to cross-examine him?
19         I've got his report.  I've reviewed his report
20    that was submitted.  So I have that information in front
21    of me.
22         MR. LESSLEY:  Your Honor, I'm -- I would like
23    to examine Dr. Mesibov first.
24         THE COURT:  Go ahead.
25         THE CLERK:  Should I swear the witness, Judge?
```

1          THE COURT:  Yes.

2          THE CLERK:  Dr. Mesibov, could you please raise

3    your right hand.

4          (The witness was sworn.)

5          THE CLERK:  Thank you.  Could you please state

6    your name for the record, spelling your first and last

7    name.

8          THE WITNESS:  Gary, G-A-R-Y, Mesibov,

9    M-E-S-I-B-O-V.

10         THE CLERK:  Thank you.

11                    DIRECT EXAMINATION

12   BY MR. LESSLEY:

13   Q.    Dr. Mesibov, this is Bryan Lessley.  You've

14   been retained by my office to assist us with various

15   aspects of our representation of Cody Crawford; is that

16   correct?

17   A.    Yes, sir.

18   Q.    And did you receive the motion for pretrial

19   release that I filed with the court with several

20   attachments?

21   A.    I did.

22   Q.    And Exhibit A is what appears to be your

23   curriculum vitae.  Is that, in fact, what it is?

24   A.    Yes, sir.

25   Q.    Your current employment is as an emeritus

1    professor at the University of North Carolina at Chapel

2    Hill; is that correct?

3        A.     Yes, sir, it is.

4        Q.     And tell us -- we're all fairly familiar with

5    academics, but tell us in a nutshell what emeritus

6    professor means?

7        A.     Emeritus professor means that you have achieved

8    the highest rank at the university and have served with

9    distinction.  And when you officially retire from the

10   university, which I have done, so I'm no longer paid by

11   the university, you have a lifelong connection.  So I

12   continue to work here at the university office, I

13   continue to work with students, and I also work with

14   clients and consult with other programs.  But emeritus

15   is my connection to the University of North Carolina.

16       Q.     And your field of study through your career is

17   in psychology; and specifically with some emphasis on

18   autism; is that correct?

19       A.     Right.  Psychology, developmental disabilities,

20   and probably most intensively autism.

21       Q.     And in addition to being an emeritus professor

22   with university connections, do you also maintain any

23   clinical practice or supervisory functions?

24       A.     I do.  I continue to work with students.  I

25   continue to collaborate on grants.  I continue to work

1  with clients and families.  And continue to consult with

2  programs both nationally and internationally.

3      Q.    And I'm not going to ask you to go through your

4  CV at great length but there are a few aspects of it I'd

5  like to touch on momentarily.

6            First, at the bottom of page 5 and continuing

7  on to page 6, there is a listing of professional

8  societies.  And you've listed yourself as a fellow of

9  the American Psychological Association in various

10 respects.  Can you tell us what that means, please.

11     A.    Well, the regular status for a psychologist in

12 that organization is as a member.  But there is a

13 special committee -- fellows committee -- in each

14 division for people who have achieved higher status and

15 more accomplishments in their area.  And I'm a fellow in

16 clinical psychology, also in developmental disabilities,

17 also in pediatric psychology.

18     Q.    And continuing down that same page 6, we see

19 editorial appointments, and specifically the editor of

20 the Journal of Autism and Developmental Disorders.

21 Could you tell us about that journal and about your

22 involvement with it.

23     A.    Well, the Journal of Autism and Developmental

24 Disorders was actually the first interdisciplinary

25 journal in the field of autism.  It was started by the

1    person who was the first person who coined the term

2    autism, Leo Kanner, and he was a professor at Johns

3    Hopkins and wrote the paper in 1943.  And he was the

4    first editor and has remained the largest, which means

5    the biggest circulation and then they had citation

6    indexes in our field, which refers to how often a

7    journal is cited.  And it's cited more than any other

8    journal in the field of autism.

9             So I've been associated with the journal for

10   many years; as an associate editor since 1983; on the

11   editorial board since '82; and reviewed papers starting

12   in 1977; and then served as the editor of the journal

13   for ten years from 1998 to 2008.

14       Q.    So if I understood correctly, you spent

15   approximately 10 or 11 years as the editor of the

16   leading journal in the field of autism?

17       A.    Correct, 10 years.

18       Q.    And to this day do you still do peer reviews

19   of --

20       A.    I do.

21       Q.    -- works authored by others?

22             And I'm skipping around on your CV just a

23   little bit but if you'd look between pages 2 and 4, a

24   list of special honors and awards.  Is there a

25   particular lifetime award or lifetime career achievement

1    award that stands out?

2         A.    The Autism Society of America, which is the --

3    one of the largest parent professional groups in the

4    country, which was established around 1965, they have a

5    large or special contributions -- career contributions

6    in the field.  They call it their Founder's Award.  And

7    I was honored with that in 2010.

8         Q.    How many people have received the Founder's

9    Award?

10        A.    Since I know I was the fifth person to receive

11   the award.  And at the time I received it -- I'm not

12   sure since then -- I think I was the only one of those

13   people still living.

14        Q.    Thank you.  Have you had occasion in the past

15   to participate as an expert witness in any form of

16   litigation whether it be judicial or administrative

17   kinds of proceedings?

18        A.    Yes, I have.

19        Q.    And have you qualified as an expert in

20   psychology or specifically in developmental disabilities

21   or autism on other occasions?

22        A.    Yes, I have.

23        Q.    About how many occasions have you been admitted

24   by a court or a proceeding as an expert in those fields?

25        A.    I would guess over the years, 20, 25, something

1    like that.

2                  MR. LESSLEY:  Your Honor, we'd ask that the

3    court accept Exhibit A as his CV and admit him as an

4    expert in the fields I just stated.

5                  THE COURT:  All right.  I will.

6    BY MR. LESSLEY:

7         Q.    Dr. Mesibov, in the course of the work that we

8    have asked you to perform, have you reviewed certain

9    records provided by my office?

10        A.    Yes, I have.

11        Q.    And last Friday I sent an e-mail to you,

12   Mr. Fitzgerald, and Ms. Gold with a fairly large volume

13   of attachments beginning with a redacted copy of a

14   letter I wrote to you.  Do you have that -- do you have

15   that e-mail with that attachment?

16        A.    I'm sorry, are you asking me that?

17        Q.    Yes, Your Honor -- I'm sorry, yes, Dr. Mesibov.

18        A.    Yes, I have that.

19                 MR. LESSLEY:  Your Honor, I've tendered to the

20   court what I've marked as Exhibit F.

21                 Ms. Gold, I did not have an exhibit number on

22   it when I sent it last Friday, but it is the same

23   attachment.

24                 MS. GOLD:  Okay.

25   BY MR. LESSLEY:

1      Q.    And is that a list of the materials that we

2  have sent you to review in the course of your duties

3  that we've retained you for?

4      A.    Yes, it is.

5      Q.    And to put it in a little bit of a colloquial

6  terms, it's the good, the bad, and the ugly about

7  Mr. Crawford's life; is that correct?

8      A.    That's correct.

9      Q.    Police reports, hospital records, other

10 materials available about his conduct, and status at

11 various times; is that correct?

12     A.    Correct.

13     Q.    Also includes audio and video of various

14 interactions with police authorities or hospital

15 authorities or others, correct?

16     A.    That's correct.

17     Q.    And in the course of your work of both -- well,

18 first of all, have you consulted also with any of

19 Mr. Crawford's family members?

20     A.    I did.

21     Q.    And you've also met with Mr. Crawford; is that

22 correct?

23     A.    I did.  That's correct.

24     Q.    In the course of obtaining history or any

25 other -- well, let me also ask, does this also include

1   the reports in the discovery provided us by the

2   government in this particular case?

3       A.     Yes.

4       Q.     All right.  And so in the course of your work

5   obtaining histories or whatever you've done, does this

6   seem to be a complete encapsulation of the documents

7   relating to Mr. Crawford's life?

8       A.     It was fairly thorough and very complete, yes.

9       Q.     And in writing your opinion or making your

10  assessment, you have taken these materials into account,

11  correct?

12      A.     I have.

13      Q.     Now, a moment ago I asked you and you answered

14  that you had met with Mr. Crawford.  Could you please

15  tell us how long you met with Mr. Crawford?

16      A.     I met with him for a total of ten hours over

17  two days.

18      Q.     And in the course of meeting with him, did you

19  also administer certain tests?

20      A.     I did.

21      Q.     All right.  Now, attached to my original motion

22  for pretrial release is what I labeled as Exhibit B,

23  which is entitled evaluation report, and it lasts three

24  pages, signed by you at the end.  Do you have that

25  document?

1    A.    I do.

2    Q.    And is that a report written by you as a result

3    of your meetings with Mr. Crawford and other work that

4    you've done?

5    A.    It is.

6    Q.    All right.  In the second paragraph of that

7    letter, it describes various tests that you've -- that

8    you administered.  Can you describe those, please.

9    A.    Yes.  The first one is the Autism Diagnostic

10   Observation Schedule.  I administered Module 4, which is

11   for adults with considerable language -- adolescents and

12   adults with considerable language, considered the so-

13   called gold standard in the field.

14        I administered the autism -- the Autistic

15   Spectrum Quotient.

16        I administered the Ritvo Autism Asperger

17   Diagnostic Scale, Revised.

18        I administered the St. Andrews Healthcare

19   HCR-20 violence risk assessment worksheet.

20        And I administered the Structured Clinical

21   Interview for DSM-IV.

22        And then there is a parent questionnaire,

23   because early history is important in the diagnosis of

24   autism.  And so the -- the most commonly used one in

25   terms of diagnosis is the Social Communication

1   Questionnaire, which is SCQ.  And Mrs. Crawford

2   completed that.

3        Q.    And returned it to you?

4        A.    And returned it to me, right.

5        Q.    Now -- and did you also ask questions or

6   provide a written questionnaire to Mr. Crawford's

7   sister, Ashley?

8        A.    I did.  I spent an hour talking with her.  And

9   she also -- there are parts of the autism -- the Social

10  Communication Questionnaire deals with things in the

11  home which occur very early, the first five years of

12  life.  She wasn't able to complete that.  But she did

13  complete the half that involved things that --

14  characteristics that appear later than that.  So she

15  talked for an hour, and then she completed the

16  questionnaire, and returned it to me.

17            MR. LESSLEY:  Your Honor, at this time I'd move

18  to admit Exhibit B, the evaluation report; and Exhibit

19  F, the list of items that he reviewed.

20            THE COURT:  All right.  I have the Exhibit B in

21  front of me already, but it will be admitted.

22  BY MR. LESSLEY:

23       Q.    Dr. Mesibov, because we all have the written

24  report, I don't want to belabor all of the things that

25  you've written in there, but I would like to bring some

1    things out for perhaps more clarity and some more

2    elucidation.  What was your diagnosis of Mr. Crawford?

3        A.    Autism spectrum disorder.  And under the

4    current -- the diagnostic system is currently undergoing

5    review.  And under the old criteria, he would have fit

6    the characterization of Asperger's Syndrome.  But that

7    is going to be eliminated as a criteria.  And the

8    diagnosis is just going to be autism spectrum disorder.

9        Q.    Okay.  And explain to us what autism spectrum

10   disorder is or what it means in terms of a person's

11   functioning.

12       A.    Okay.  Well, first of all, it's a spectrum.

13   And that's important because there is an enormous range

14   of -- including people with IQs below 25 and no

15   language, as well as people with IQs of over 170, and

16   everything in between, and very, very complex language.

17   So it's a spectrum disorder.

18             It's also a neurodevelopmental disorder.  So

19   that means neuro, brain.  It relates to the brain.  And

20   thought that the brains of people with autism function

21   differently from the brains of typical people.

22             And developmental means that it is separated

23   from things like strokes or car accidents, open head

24   injuries.  These are things that happen while the brain

25   is forming.  So it means that the brain is organized and

1    integrated and works differently from the brain of a

2    typical person.  And this is lifelong, because it occurs

3    during the formative stage.

4         The characteristics -- the most important

5    characteristics that one looks for, although, of course,

6    everybody doesn't have all the characteristics to the

7    same degree, but the primary characteristic is social

8    interaction.  That there are difficulties and problems

9    with reciprocal social interaction, kind of the back and

10   forth social communication, the back and forth.

11        There is difficulties with -- or there is a

12   characteristic pattern of narrow, repetitive behaviors

13   that one frequently sees.

14        There also is a very concrete literalness in

15   terms of their understanding of language.  So people

16   with autism spectrum disorders are very good at facts.

17   They are very good at specific details, not so good at

18   concepts, not so good -- they'll read factual materials

19   rather than novels, for example, on the most part, and

20   do much better with those things.

21        There is also a difference in the sensory

22   system in the sense that their sensory system on one

23   level is sometimes more acute, they are more likely to

24   hear noises, more likely to spot the small detail in the

25   distance, but also more likely to be overwhelmed, and so

1    in other words, overstimulated by a noisy environment or

2    a bright environment or an environment where there is a

3    lot of movement.

4          There is also a tendency for emotional lability

5    in people with autism.  And that is thought to be kind

6    of a combination of having difficulty understanding

7    things, particularly verbal language, difficulty

8    figuring things out, easily overwhelmed in terms of

9    their senses.  So that also seems to be part of the

10   pattern.  So those are the major characteristics with

11   the emphasis on the social interaction or communication.

12         I guess the other thing is -- the other aspect

13   of it that I think is really important and sometimes

14   confuses people is the difficulty of dealing with

15   multiple sources of information at the same time.

16         Erica Shane (phonetic), a famous

17   neuropsychology (sic) in 1993 wrote a paper talking

18   about a flashlight with an expanding beam and saying

19   that people with autism spectrum disorders, it's like

20   their world and their conceptual framework is like the

21   narrowest beam.  So they perceive very narrow things but

22   they perceive them very acutely.  Whereas typical people

23   would have a much broader beam.  So those of us with

24   typical brains would be able to see multiple sources of

25   information, integrate that information, but not

1    conceptualize or see some of those details and some of

2    those facts to the same degree.

3        Q.    Dr. Mesibov, now I'd like to turn our focus to

4    the immediate matter at hand, which is the matter of

5    Mr. Crawford's release from custody.

6             Are you -- you are familiar with times and in

7    his past when he has had significant behavioral problems

8    that have manifested themselves in public ways and

9    resulted in interactions with law enforcement and the

10   justice system; is that correct?

11       A.    Yes, I am.

12       Q.    And let me draw your attention to two such

13   times.  The first time being June 2009 upon his return

14   from Panama, continuing into July of 2009.  And the

15   second being the period of November 28, 2010, that is

16   the night of the mosque fire, until the middle of

17   December 2010 when he had some behavioral issues.

18            Have you received documentation of both of

19   those periods of time?

20       A.    Excuse me.  Yes, I did.

21       Q.    All right.  Police reports and court reports

22   and things like that?

23       A.    Right, correct.

24       Q.    And you've read some of what those episodes

25   were like.  And they were -- some of them -- kind of out

1    there in terms of his behavior.  Throwing urine and

2    saliva at a deputy at the jail was one instance that he

3    was at least accused of having done.  Spitting food on

4    an officer.  Those kinds of things.  You are aware of

5    those incidents; is that correct?

6        A.    Yes, sir.

7        Q.    And I'd like you to talk about -- given your

8    awareness of those incidents and of his history -- to

9    talk about the question that we're leading to here,

10   which is his ability to function in a peaceful manner in

11   the community if he were to be released from custody.

12           And you've given us your written opinion about

13   that, but I'd like you to explain your thoughts, please.

14       A.    Well, certainly when you look at his records

15   he's had periods of productivity and appropriate

16   behavior, and then of course the situations that you are

17   describing that you are talking about.

18           I do believe in terms of all the instruments

19   that I've given him and worked with him that he does fit

20   the diagnosis of autism spectrum disorder.  And there is

21   a certain amount of emotional lability often tied to

22   anxiety in people who have autism spectrum disorders.

23   And, you know, a lot of times they can occur on a daily

24   basis, maybe more with children.  We use the term

25   meltdowns where they basically lose their control and

1    their contact with reality.

2            I think in Cody's case his anxiety is higher

3    than average, at least as a young adult.  I think that's

4    probably a function of his history.  He's certainly had

5    a lot of unfortunate mis-events in his upbringing,

6    which, unfortunately, happens to a lot of people with

7    autism.  His seem to exceed that in terms of some of the

8    abuse in his background, some of the people he thought

9    he could trust who it turned out not to be able to

10   trust, even being in programs which were closed down

11   because of harsh and inappropriate treatment.  So I

12   think he was more vulnerable and more susceptible to

13   high anxiety.

14           Now, there is a small group of people with

15   autism, and probably they don't really know much about

16   this group, whether it's a history that accounts for it

17   or maybe there is something about his autism, but

18   anyway, when they are in periods of very high anxiety,

19   these people with autism are usually tied to

20   uncertainty, unpredictability, inconsistency in their

21   environment that their meltdown, if you will, becomes

22   extreme and very out of control, or to use the term "out

23   there."  They use the term brief reactive psychosis as

24   probably the closest diagnosis term, but nothing fits it

25   exactly.

1        But where he goes into this state, they use

2    brief psychotic because that's what it is.  He's

3    emotionally -- in emotional turmoil, overwhelmingly

4    confused and disoriented.  They hallucinate.  And he did

5    describe very vivid hallucinations during this period.

6    And incoherent.  And that's when he does these things,

7    many of which he doesn't even remember afterwards.

8        And then, of course, the ability to control

9    himself is very, very limited at those times.

10   Q.   Dr. Mesibov, let me -- let me --

11   A.   (Inaudible) -- with autism spectrum diagnoses,

12   we know the triggers for those things, at least in this

13   group.  Sometimes other people who show those behaviors,

14   we're never sure when they are going to happen, or

15   what's going to happen in public.

16       I think with Mr. Crawford, I think they occur

17   under periods of extreme anxiety and extreme stress.  I

18   think sometimes in his case, again, another unfortunate

19   occurrence, is he was introduced to alcohol at a very,

20   very young age, and that sometimes when he gets

21   extremely stressed and upset, his coping strategy is to

22   consume large quantities of alcohol.  And that makes the

23   anxiety worse, that makes the -- it interacts with his

24   anxiety and what's going on to make the situation even

25   worse, even more intense and longer lasting.

1          I think in his life when those triggers have

2   not occurred, and, again, he's been unfortunate, most of

3   us don't have the situation that he did where he went

4   through -- was sent to a school, it was a reputable

5   school, and then all of a sudden it closes down, and

6   he's in the middle of Costa Rica, and has to cope and

7   has to survive.  And then I think in terms of some of

8   the things that were happening there, broke down.  That

9   was the kind of -- more of this anxiety, which triggered

10  this.

11         And then in the situation around the mosque and

12  the fire in the mosque, and I think just by the nature

13  of the police investigation into a crime like that is

14  going to be very unpredictable because police have to go

15  one step at a time and figure out what this means and

16  then what they are going to do next.  So he went through

17  this period of repeated searches at the house, certainly

18  loss of control.  Sometimes his mother and sister were

19  there.  Sometimes they weren't there.  People he usually

20  counts on, he couldn't really count on.  The publicity,

21  the neighbors, the destruction, continued police

22  presence in the neighborhood, continued uncertainty of

23  what was going to happen to him.

24         So the times that this has occurred have been

25  the times of enormous destruction and unpredictability

1    and anxiety.  And I think that that's my understanding

2    of what happened in those situations.  And that

3    basically there are two people.  And the one who

4    is -- is -- is in situations which are organized and

5    predictable, secure, with people he can trust, where he

6    has meaningful activities to do are the ones I think he

7    does well.

8            When these triggers come, then the anxiety,

9    plus the unpredictability which grows as he gets more

10   and more anxious.  And the alcohol, I think, contribute

11   to those kinds of behaviors.  And those -- (inaudible).

12       Q.    Dr. Mesibov --

13       A.    (Inaudible.)

14       Q.    Dr. Mesibov, let me stop and maybe we can put

15   all of that very helpful information in a shorter -- in

16   a context here.

17           You've described in your letter at the bottom

18   of the first page that he has a strong need for order,

19   sameness, and predictability in his daily routine.

20   Those are your words.

21           You've reviewed periods of his past when he has

22   had those things; is that correct?

23       A.    I'm so sorry, I didn't hear the last part of

24   that.

25       Q.    You have -- you are aware of periods of

1    Mr. Crawford's life when he has had order, sameness,

2    predictability in daily routine, when he's living at

3    home with his family and his son and did not encounter

4    problems.  Are you aware of periods such as that in his

5    life?

6        A.    Yeah, absolutely.  I think the period once he

7    settled in after coming back from Panama and a period

8    between that and the fire at the mosque is a good

9    example of that as a young adult so --

10        Q.    And that was a period of about a year?

11        A.    (Inaudible) -- there have been periods of

12    settled consistency and predictability in his life when

13    he's -- when he's been able to function at a very

14    appropriate and very high level.

15        Q.    Okay.  So -- and just to be clear that we're

16    talking about the same period, we're basically talking

17    about the period of October 2009 until his -- the mosque

18    fire and those disturbances; is that correct?

19        A.    The period from October 2009, right, until

20    November 2010, correct.

21        Q.    So a period of 13 months with order, sameness,

22    and predictability in his daily routine, living with his

23    family, being with his son, in which there were not

24    behavioral problems, correct?

25        A.    Correct.

1    Q.    And then after he got out of Oregon State

2    Hospital in April of 2010 until his arrest in August of

3    2010, would that be another one of those periods?

4    A.    As far as I could determine, yes.

5    Q.    All right.  And you've mentioned several times

6    the word "triggers."  And what I take that to mean and

7    sometimes it helps to put it in my own words and tell me

8    if I'm right, but that is that we -- you mentioned that

9    we know what his triggers are; that his leaving this

10   period of stability and becoming into this -- I think

11   you described it as a temporary psychotic break -- is

12   predictable in the sense that we know what happens in

13   his life or what kinds of things cause him to behave

14   that way, correct?

15   A.    Yeah.  And that's why I think the diagnosis of

16   autism spectrum disorder is important because that is

17   usually the case with this group that those kinds of

18   behavioral outbursts do have specific triggers.

19   Q.    And the triggers in Mr. Crawford's case being

20   high anxiety, stress, and perhaps in combination with

21   alcohol?

22   A.    Right.  In particular when his life gets -- you

23   know, to say it as briefly as possible -- out of

24   control.  But for him out of control is not predictable,

25   where his behaviors or routines are the things that he

1    understands, that he's used to doing, he's no longer

2    able to do, or they no longer work, or they are no

3    longer effective, yes.

4         Q.    Now, let me shift gears a little bit, and this,

5    I think, will probably be the last area that I'll cover

6    with you before we give Ms. Gold a chance, but --

7         A.    Okay.

8         Q.    -- the suggestion that we've made to the court

9    is that Mr. Crawford can be in one of these periods of

10   order, sameness, and predictability if he's allowed to

11   live with his mother, his sister, his son, in the home

12   that they've established.

13        The government has expressed some concern about

14   the mother, in particular, and I don't know if it

15   extends to other family members about -- they've used

16   terms like enabling or things like that.

17        Do you have any concerns about that kind of

18   behavior or any observations about what the government

19   has called enabling behavior in terms of your experience

20   and training?

21        A.    Well, I think somebody who is an enabler is

22   somebody who -- you know, if she was providing him -- I

23   mean, I think somebody who provides him with alcohol,

24   that would be an enabler.  And I don't think his mother

25   does that.

1          I think why some people might use that term

2    is -- and I've worked with parents with children with

3    autism who have language and conception ability for

4    38 years, and there is no group I have more respect for

5    because they have children who are puzzling.  I mean,

6    Cody is, in many ways -- and I spent ten hours with

7    him -- he's a delightful, interesting, young man.

8          But there are -- and that's what the key to

9    this disability is.  His cognitive ability, he's

10   (inaudible), his IQ is as high as mine probably.  But

11   there are certain things and certain ways in which he is

12   like a ten-year-old.  He's -- in terms of his level of

13   function.  And he sometimes can be naive.  He can

14   sometimes be more Pollyannaish in his understanding.

15   And he even knows this and readily talks about it, his

16   understanding of social conventions and social chitchat

17   is very, very primitive.  Those things are very

18   complicated for him because that's what's difficult.

19         So his mother -- Cody's mom, as all of these

20   moms, constantly -- you know, particularly with Cody

21   because in his day, we didn't know people with autism

22   who had higher IQs.  So she's constantly trying to

23   explain and help him out of situations that other people

24   think she should be able to do, he should be able to

25   handle, because she understands him better than probably

1   anybody else in the world understands him.  These

2   parents understand their children like that.

3          So she -- I think she lines up in this

4   situation, he's very vulnerable, and she's certainly

5   seen his vulnerability in his life.  That's contributed

6   to a lot of the areas where he has had difficulty is his

7   personal vulnerability and lack of sophistication and

8   naivete, and not being able to figure out who's his

9   friend and who's not his friend, and not having good

10  coping strategies for his anxiety.

11         So she spends her whole life, as do all of

12  these mothers, seeing that and having to try to protect

13  them.  And yet having to also try to let him get his

14  freedom so that he can have a good life.  And having to

15  find programs that are going to understand them.

16         So I think -- you know, I think many people

17  misinterpret, because they don't understand the autism

18  spectrum disorder, how difficult it is for these

19  parents.

20         And certainly in her filling out the

21  questionnaires and in our conversation on the telephone

22  after she did that, I think she does have a very deep

23  and good understanding of Cody, and his strengths, and

24  the ways in which he's a terrific guy, but also his

25  tremendous limitations which sometimes get him in

1    trouble.  And so she's -- you know, she's running around

2    the world putting out fires, as she has been.

3            He was one of the first human identified, if I

4    remember right, for special education in the State of

5    Oregon.  And he was a complicated one.

6            So I think that's the dynamic.  You know, I

7    don't consider that enabling.  I consider that a very

8    realistic assessment of, you know, just his positive

9    worth and value, but also to some of his --

10           THE COURT:  Doctor, let me interrupt --

11           THE WITNESS:  (Inaudible.)

12           THE COURT:  Doctor --

13           MR. LESSLEY:  Doctor --

14           THE WITNESS:  (Inaudible) -- same

15   understanding.  And, you know, of course she's --

16           THE COURT:  Dr. Mesibov?

17           THE WITNESS:  -- chosen to put Cody in the same

18   situation as often, but in terms of the living

19   situation, living with these people who he trusts, who

20   he cares about, who understand him, I mean, you know,

21   that's where he's going to get a productive life.  And

22   then hopefully in the long run will -- (inaudible) --

23   because somebody should have taught him how he should

24   cope with this anxiety, because there weren't many

25   professionals who understood it.  But hopefully in the

1    long run, he'll be able to learn those strategies

2    because I think this is a field where understanding --

3              THE COURT:  Dr. Mesibov --

4              THE WITNESS:  (Inaudible) -- that will help.

5    Yes?  I'm sorry?

6              THE COURT:  All right.  I'm sorry to interrupt

7    you.  This is Judge Coffin.  We're going to run out of

8    time before the noon hour for Ms. Gold to cross-examine

9    you.  So I take it you're available this afternoon?

10             THE WITNESS:  I'm available as long as you need

11   me.

12             THE COURT:  All right.  Can we --

13             THE WITNESS:  Sorry.  I didn't mean to

14   (inaudible) -- I didn't know there was a time limit.

15   BY MR. LESSLEY:

16     Q.    I actually just had one last -- I think this is

17   actually the last question that I had.  And that is that

18   a hope was expressed that the time in jail has not made

19   Mr. Crawford into someone who is bitter or angry.  And

20   you saw him relatively recently.  Did you see any signs

21   of bitterness or anger that would cause you any concern?

22     A.    No, I saw no signs of that at all.  In fact, if

23   Cody has a weakness related to that, it's quite the

24   opposite.  He's a bit Pollyannaish.  And he sees the

25   whole world and everything in it maybe sometimes more

1   positively than is in his best interests, and, you know,

2   maybe more skepticism about people and their motives,

3   but I see absolutely -- I saw absolutely no sign of

4   that, towards them or towards anybody.

5           MR. LESSLEY:  All right.  Thank you,

6   Dr. Mesibov.  Those are my questions.

7           THE WITNESS:  Thank you.

8           THE COURT:  All right.  Ms. Gold?

9           MS. GOLD:  Yes, Your Honor.

10          THE COURT:  You may cross-examine.

11          MS. GOLD:  Thank you.

12                    CROSS-EXAMINATION

13  BY MS. GOLD:

14     Q.    Dr. Mesibov, my name is Fara Gold.  I'm one of

15  the prosecutors on the case.

16     A.    Yes, ma'am.

17     Q.    Good afternoon.  I've got a few questions

18  about --

19          THE REPORTER:  I'm sorry, I can't hear her.

20          THE COURT:  Ms. Gold, could you slow down,

21  please.  Our court reporter is having trouble.

22          (Ms. Gold continues talking while the reporter,

23  the clerk, and Judge Coffin try to intervene.)

24          THE COURT:  Okay.  Let's back up and start

25  over.  Ms. Gold, if you can ask your question.

1   BY MS. GOLD:

2      Q.    My question was, Doctor, if you could just

3   clarify what you meant by "extreme psychotic break."

4      A.    Okay.  I think I -- we used that term and I

5   didn't need to.  I meant to use it as a comparison

6   because sometimes people understand that.

7            I think what I meant to say he had -- this is

8   what I would describe as a brief reactive, reactive to

9   the anxiety and the situation, psychosis.  And then I

10  was just describing some of the characteristics of that,

11  including disorientation, overwhelming confusion,

12  hallucinations.

13           So during that period his contact with reality

14  is quite limited.  And, again, I'm not quite sure how I

15  used that term, but maybe trying to compare and give an

16  understanding that he's totally incoherent,

17  overwhelmingly confused and disoriented.

18     Q.    And it is fair to say that somebody who is

19  experiencing that type of psychosis can be violent?

20     A.    I think they certainly do things they don't do

21  other times.  And, yes, sure, that could be -- that

22  could be one of them.

23     Q.    And you testified earlier that extreme anxiety

24  are triggers for Cody Crawford, correct?

25     A.    Correct.

1     Q.    And based upon your time with Cody in the jail,

2   you have -- you've experienced, as you said, him to be

3   slightly Pollyannaish and somewhat calm; is that fair to

4   say?

5     A.    I -- certainly Pollyannaish.  In terms of calm,

6   I'm not sure I said that.  He was certainly calm and

7   attentive and responsive to me.  I'm not sure I would

8   use the word -- I mean psychologically calm.  He wasn't

9   anxious.  He wasn't out of control.  I mean, he's an

10  animated, interactive -- well, not interactive very

11  much, but he's an animated person and an animated

12  talker.  And he gets very interested and sometimes

13  excited about the things that he talks about.  So I'm

14  not sure it's the right word.

15    Q.    (Inaudible.)

16    A.    He certainly wasn't agitated.  He certainly

17  didn't seem anxious.  He certainly wasn't out of

18  control.  But agitated certainly -- but enthusiastic, I

19  would say.

20    Q.    Okay.  But there was nothing about his behavior

21  in your time with him that was indicative of this kind

22  of extreme anxiety that could trigger an episode?

23    A.    No, no, there wasn't.

24    Q.    And are you aware of any such episodes since

25  he's been in custody for this particular case?

1    A.    I had very little information about when he was

2  in custody.  But it was certainly my impression that he

3  was polite, he was respectful.  So I saw no sign of

4  anything.  But, again, I was not given that.  That's the

5  one period I wasn't given any access to any information

6  about him.  So I just had Cody's description, but it

7  sounds like he's moved up in terms of his

8  responsibilities.

9    Q.    And are you aware that the beginning of this

10  hearing when it occurred the other day, Cody read a

11  letter to the court in which he discussed getting along

12  with the deputies and being productive and making bread

13  and so forth?

14    A.    I think I am aware of that.  I'm not sure if I

15  saw it word for word, but I am aware of that, yes.

16    Q.    Okay.  And, again, that type of behavior,

17  getting along with the deputies and being productive, is

18  not consistent with these episodes triggered by extreme

19  anxiety, correct?

20    A.    Correct.

21    Q.    Okay.  And you testified earlier that you spent

22  time with Robin Crawford; is that correct?

23    A.    I didn't spend time with her directly because

24  of the schedules.  I did spend time with her on the

25  phone.  She did fill out the questionnaire.  I did go

1   over the questionnaire.  I've spent, I think, about two

2   hours with her on the telephone.

3       Q.    But you didn't actually get to meet her face to

4   face, correct?

5       A.    Correct.

6       Q.    Okay.  Did you review Cody Crawford's criminal

7   history when you wrote your evaluation report and came

8   to your conclusion that he's not a danger to the

9   community?

10      A.    Correct.

11      Q.    You did?  So, Dr. Mesibov, you are aware of his

12  prior burglaries, assault on public safety officers,

13  distribution of marijuana and so forth?

14      A.    I'm aware of those.  I -- again, I think in my

15  report I said his -- when he's in a safe and secure and

16  predictable environment, and I think he's not a danger

17  to the public, and I think that's the state he's in at

18  this point, and I think would be if he were in his home.

19          So, actually, I am also aware of the time he's

20  not been.  And as I said, I think those are the times

21  when those triggers are present.

22      Q.    Okay.  And were you aware that at some of those

23  arrests he was living with his mother, Robin Crawford?

24      A.    Which ones are -- which arrests are you talking

25  about, I'm sorry?

1     Q.    The burglary, the burglary, the theft, the

2   distribution of marijuana, the distribution of alcohol

3   by a minor.

4     A.    Okay.  In those situations, as I say, those, I

5   think, are a slightly different class of behaviors, but

6   I was not aware of dangerous and aggressive behaviors at

7   that time.

8     Q.    Okay.

9     A.    So I'm aware of the fact that he was living

10  with his mother, and he was arrested for these things.

11  I was not aware of aggressive behaviors at those times.

12    Q.    Okay.  And when there is a discussion on direct

13  examination of Robin Crawford and other enabling or

14  being a champion of her son, and I'm not -- certainly

15  not making generalizations about parents with

16  disabilities, I know there are -- a lot of them can be

17  champions.

18          Specifically with Robin Crawford, are you aware

19  of the circumstances of the role she played each time

20  Cody Crawford was arrested for something?

21    A.    I don't think -- you know, I think the only one

22  that I'm very aware of -- and, again, there are a lot

23  of -- a lot of information, so I might have forgotten

24  some of the details.  The only time I was very aware of

25  it was this last arrest for this offense.  I don't

1    remember the role she played in the arrests at other

2    times.

3        Q.    There are reports that she actually turned on

4    her video camera to record the arrests, you aren't aware

5    of that?

6        A.    In this particular case --

7        Q.    Okay.

8        A.    Are you talking about in this -- are you

9    talking about in this case or other cases?

10       Q.    I'm talking about in the past when Cody

11   Crawford was arrested, and Robin Crawford oftentimes

12   would record it with a video camera, are you aware of

13   that?

14       A.    I don't remember those details.  You know, I --

15   I can't say they weren't in the record, I just don't

16   remember.

17       Q.    Okay.  Would it be -- in your professional

18   opinion, would it add to the anxiety if his mother

19   turned on the video camera while he was being arrested?

20       A.    You mean Cody's reaction to being videoed?

21   Gee, that's a good question.  You know, I think those

22   are very anxious situations for him, to be sure.  It

23   certainly could.  You know, I don't know how he feels

24   about being videotaped.  But, you know, on the other

25   hand, he has a lot of confidence in his mother, and so

1    the fact that she was doing it, you know, might mitigate

2    that.  But I honestly can't say.

3            I can certainly see that that could contribute

4    to his anxiety in certain circumstances.  But never --

5    he and I never talked about that or the idea of his

6    being videotaped or how he feels about it, so I couldn't

7    say definitively.

8    Q.    Well, would it add to Cody's anxiety if his

9    mother tried to physically stop the police officers from

10   arresting him?

11   A.    Again, you know, I don't know how Cody feels

12   about it.  I -- you know, again, generalizing from

13   mothers and from what I think about his mother, you

14   know, when they are in very vulnerable situations like

15   that, when somebody is arresting them, and given some of

16   their characteristics, they don't react and don't --

17   people with autism don't deal with these situations very

18   well.

19           And I think that parents -- and probably his

20   mother, although I never talked about that, so they're

21   very afraid that they are going to incriminate

22   themselves because they are not very good about -- you

23   know, those are exactly the kinds of situations where

24   they have the most difficulty with, where you have to

25   sort through different perspectives and different ideas

1    and understand what he did and what the police are

2    trying to do, and what his rights are, and the police

3    and what his responsibilities are.  You know, those are

4    horrible situations for somebody with autism spectrum

5    disorders.

6              So I think in that situation -- again, I'm

7    speculating just based on my general experience --

8    parents are usually more thinking about trying to

9    protect their vulnerable children than what the impact

10   on their children is going to be.

11             So, again, I didn't discuss that with her.  I

12   didn't discuss it with Cody.  It doesn't -- don't know

13   how he's feeling.  It certainly could have increased his

14   anxiety, but I -- there is so much anxiety around a

15   situation like that with a child like Cody who is still

16   vulnerable that -- and, again, there is a lot going on.

17   And usually parents -- and just based on the things his

18   mother told me, I think it's true is she's trying to

19   protect him because he's very vulnerable.

20     Q.    Okay.  And, obviously, it's an anxious time for

21   anybody, when any child is arrested in front of their

22   parents, regardless of whether they have -- they fall in

23   the autism spectrum disorder, correct?

24     A.    Yeah, any child does.  But, again, they are not

25   as vulnerable.  And that's a part of Cody that's very

1   vulnerable, but people who don't understand Cody and

2   Cody's difficulty and hear him talk and hear what he

3   does, don't fully appreciate how vulnerable he is.  So I

4   think that, sure, it's really hard on any parent, of

5   course.  And it's hard on any child.  But then it's

6   particularly hard if you have a child who looks and acts

7   and sounds like a typical child, and yet is very

8   particularly vulnerable in a complicated situation like

9   that.

10       Q.    Okay.  Doctor, the United States' main concern

11  at this point is that is he a danger to the community.

12  And I want to press this by saying I don't doubt that

13  many people want to get out of jail.

14           But in terms of Cody's lack of danger to the

15  community, you say you don't believe he's a danger to

16  the community; is that correct?

17       A.    That is correct.

18       Q.    And you're basing that on the time with him; is

19  that right?

20       A.    I'm basing it on my time with him.  I'm basing

21  it on his history.  And I'm basing it on the fact that

22  he would be in a place, you know, basically with the

23  three people in the world he cares about and he loves

24  and he trusts.

25           And that he would be -- and, you know, I think

1   some of these situations or some of these circumstances

2   when he's gotten into trouble where he's got influences

3   of other children who he thinks he can trust and he

4   can't, or the high anxiety, I mean, they don't occur all

5   the time.  And I think as he gets older and counts more

6   on the people he cares about and care about him, that

7   he's less likely to fall into one of those situations.

8   I think his family understands the triggers better.  So,

9   yeah, I think the triggers are much less likely to be

10  there.

11       Q.    Okay.  So you are basing those opinions despite

12  his criminal history and despite the fact that he lived

13  with his mother during previous times of being arrested,

14  correct?

15       A.    Correct.

16       Q.    And you are basing it despite the fact that he

17  had access to alcohol while living with his mother prior

18  to being arrested; is that correct?

19       A.    Yeah.  But I'm assuming he would not have

20  access to alcohol in this situation.

21       Q.    Okay.

22       A.    I don't think that was -- I don't think that

23  was a condition -- I don't think that was a condition of

24  his living there last time.

25            It would be my recommendation that that would

1   be a good idea in this case.

2       Q.    Okay.  And you're also basing this opinion on

3   the fact -- well, let me rephrase.  If, in fact, Cody

4   did commit this arson for which he's been accused, would

5   that danger -- would that classify as a danger to the

6   community?

7       A.    If he did commit -- I knew --

8             MR. LESSLEY:  Your Honor, I'm going to object

9   to the question.

10            (Witness continues talking while the court

11  attempts to intervene.)

12            THE COURT:  Excuse me.

13            MR. LESSLEY:  Dr. Mesibov -- Dr. Mesibov --

14            THE WITNESS:  (Inaudible) -- I didn't consider

15  in this situation because he doesn't have any history of

16  arson or any history of harming anybody in that sense.

17  So if I knew he did it, yeah, that would change -- I

18  would certainly reconsider it and need to understand

19  that in the context of what were the factors that led to

20  that and would those factors be there.

21            So that's not information I considered or the

22  fact that he was at risk of committing arson because I

23  don't have any information that he ever did.

24  BY MS. GOLD:

25      Q.    Okay.  And then the last piece that I want to

1    talk to you about and then I will wrap it up, the second

2    part of this is the idea that he's a flight risk.

3    Obviously there is no test you can give to determine

4    whether somebody is a flight risk, correct?

5        A.    Yeah, I wish there were, but, no, I don't know

6    of any tests.  I certainly --

7        Q.    You're just -- okay.  So you're just basing

8    your opinion on the fact that he wants to go home, and

9    his mother and his sister and his son are the most

10   important people in his life based upon his own self

11   report, correct?

12       A.    Based on his own self report, based on my

13   discussion with him, based on his parent's perception,

14   yeah, I do think these are the people in the world he

15   trusts and cares about him.  There is a very limited

16   number.  And his son is his reason for living.  That's

17   the meaning in his life.  So I can't imagine where he

18   would go at this point.

19       Q.    So you didn't consider the fact that he is, in

20   fact, facing 12 years in prison or the fact that he does

21   have ties to Panama?

22       A.    (Witness begins to answer.)

23           MR. LESSLEY:  Your Honor, I'll object to the

24   question.  Dr. Mesibov, stop, please.  I'll object to

25   the question.  First, Your Honor, it assumes facts that

1    aren't true like --

2            THE COURT:  Well, Ms. Gold, if I can -- excuse

3    me a second.  Ms. Gold, it seems to me that you are

4    basically making argumentative points through your

5    cross-examination, and that's a matter, it seems like,

6    more appropriate for argument to the court on the issue.

7            MS. GOLD:  Yes, Your Honor.  I can save it for

8    argument.  I just wanted to flesh out whether he --

9    (inaudible).

10           THE COURT:  You need to slow down because the

11   court reporter is not being able to understand you.

12           MS. GOLD:  Okay.  I apologize.  I'll just --

13   it's fine.  I can save it for argument.

14           THE COURT:  All right.

15           MS. GOLD:  I have no further questions,

16   Dr. Mesibov.  Thank you.

17           THE COURT:  All right.  We're going to be in

18   recess at this time.  You don't have any more questions

19   for him, do you?

20           MR. LESSLEY:  I do not, Your Honor.

21           THE COURT:  All right.  So, Doctor, you are

22   excused from being available anymore this afternoon

23   because the parties are -- have concluded their

24   examination and cross-examination of you.  So we'll be

25   in recess --

| | |
|---|---|
| 1 | THE WITNESS: Thank you, Your Honor. |
| 2 | THE CLERK: And, Mr. Wanly, if he'd like to |
| 3 | appear. |
| 4 | THE COURT: And, Mr. Wanly, we'll get you back |
| 5 | on the phone this afternoon. We'll resume again at |
| 6 | 1:30. |
| 7 | MR. WANLY: Thank you. |
| 8 | THE COURT: And, Ms. Gold, we'll get you on the |
| 9 | phone at 1:30 as well. |
| 10 | MS. GOLD: Okay. Thank you. |
| 11 | THE COURT: We'll be in recess until 1:30. |
| 12 | (The proceedings were adjourned at 12:04 p.m.) |
| 13 | (Further proceedings were had and are bound |
| 14 | under separate cover.) |
| 15 | |
| 16 | |
| 17 | |
| 18 | |
| 19 | |
| 20 | |
| 21 | |
| 22 | |
| 23 | |
| 24 | |
| 25 | |

```
 1                        CERTIFICATE

 2          I, Deborah Wilhelm, Certified Shorthand Reporter

 3    for the State of Oregon, do hereby certify that I was

 4    present at and reported in machine shorthand the oral

 5    proceedings had in the above-entitled matter.  I hereby

 6    certify that the foregoing is a true and correct

 7    transcript, to the best of my skill and ability, dated

 8    this 9th day of August, 2012.

 9

10

11
                                /s/ Deborah Wilhelm
12                              _____
                                Deborah Wilhelm, RPR
13                              Certified Shorthand Reporter
                                Certificate No. 00-0363
14

15

16

17

18

19

20

21

22

23

24

25
```