IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

UNITED STATES OF AMERICA,              Case No. 6:11-cr-60097-AA

      Plaintiff,                       OPINION AND ORDER

   v.

CODY CRAWFORD,

      Defendant.

_____

AIKEN, Chief Judge:

Defendant is charged with damaging religious property in violation of 18 U.S.C. § 247(c) and using fire to commit a felony in violation of 18 U.S.C. § 844(h)(1). The charges arise from an arson fire committed on November 28, 2010 at the Salman Alfarisi Islamic Center, a mosque located in Corvallis, Oregon.

Defendant now moves to suppress all of his statements and conduct from December 14, 2010 through April 2011, based on lack of relevance, undue prejudice, and violations of his rights to due process and against self-incrimination. Specifically,

1    - OPINION AND ORDER

defendant argues that the statements and conduct sought to be excluded are unreliable, irrelevant and involuntary as he was in the midst of a psychotic breakdown. Defendant also contends that law enforcement officers' coercive conduct caused his breakdown and subsequent involuntary statements, and that officers questioned him after invocation of his right to counsel.

On October 7 and 8, 2014, the court held an evidentiary hearing and heard oral argument. Defendant's motion is denied, with leave to renew on evidentiary grounds prior to trial.

## BACKGROUND

During the early morning hours of November 28, 2010, a City of Corvallis Police Officer saw smoke and flames coming from the Salmon Alfarisi Islamic Center (the mosque). The Corvallis Fire Department responded and determined that the fire was set intentionally. Apparently, the arson occurred shortly after reports of a potential terrorist act at the Christmas Tree-Lighting Ceremony in Portland.

The fire was burning in the office area of the mosque near the front entrance. Investigators discovered a broken window, a brick underneath it, and a two-liter soda bottle containing a liquid that smelled like gasoline. The top of the bottle was melted, as if exposed to heat. Gasoline had been poured along the sill of the broken window and on the carpet near the window.

Officers also recovered a soda bottle cap and a blue Mag-Lite flashlight at the scene.

Law enforcement officers canvassed the surrounding neighborhood seeking witnesses to the arson. Defendant lived in the neighborhood, about 200 feet from the mosque. At approximately 11:00 a.m. on November 28, defendant was interviewed by FBI Special Agent Melanie Wissel and Corvallis Police Detective Bryan Rehnberg. Defendant stated that he knew about the fire from news reports, but he denied knowing anything more about it. Defendant also remarked that his blue Mag-Lite flashlight had been stolen from his porch. At that point, officers had not revealed publicly that a similar flashlight had been found at the mosque.

At around 5:00 p.m., Rehnberg and Detective Tyson Poole returned to defendant's home and showed him a picture of the flashlight recovered from the scene. Defendant admitted that it looked like his flashlight. According to the government, defendant also suggested that someone might have wanted to commit arson at the mosque in retaliation for the terror plot in Portland, or that a member of the mosque's congregation might have started the fire in an attempt to conceal evidence.

Based on defendant's statements, two search warrants were obtained to search defendant's home and an unattached garage; they were executed in the early morning and evening hours of

3    - OPINION AND ORDER

November 29. The FBI and police department seized cans of motor oil and a partially full gas can, along with batteries similar to those found in the flashlight and defendant's laptop computer. On November 30, 2010, officers returned with a third search warrant and obtained swabs of defendant's DNA.

Detectives also obtained a search warrant for defendant's Facebook account and discovered posts referencing the suspect in the Portland terror plot and stating that the suspect had frequented the mosque near defendant's home. Defendant also allegedly posted that he "hate[s] the ji-had'st."

Defendant maintains that a continuous police presence remained at or near his home for several days. By December 3, 2010, the media had identified defendant as a suspect in the arson. Defendant asserts that numerous reporters knocked on his door, and the media presence remained in his neighborhood for the next ten days. See Def.'s Ex. V (series).

Around this time, defendant allegedly began exhibiting "bizarre" behavior.

On the evening of December 14, 2010, defendant's mother drove him to McMinnville to visit his sister and his son. When they arrived in McMinnville, defendant exited the vehicle and ran away. Shortly afterward, police received reports of a disturbance at a gasoline station and a Blockbuster Video store located on Highway 99 West in McMinnville. Apparently, defendant

4      - OPINION AND ORDER

ran up to a car and shined his flashlight over the occupants, made several comments about Muslims and terrorists, and told the attendant that the FBI and CIA did not know of his existence. Defendant also entered an attached convenience store and made additional statements about Muslims, terrorists, the events of 9/11 and the FBI. Defendant also told an employee that he had a .45 caliber firearm. He was not armed, however. Defendant then entered a nearby Blockbuster Video store where his erratic behavior continued.

Police officers arrived and arrested defendant for creating a public disturbance. As he was being handcuffed, defendant stated that only Christians could understand him because he was a Christian warrior. Defendant also allegedly announced, "You will never know the truth about the mosque."

While being booked into the Yamhill County Jail, defendant made a number of statements, including that Muslims had his child and that his ex-wife was a Muslim (apparently, she is not). A recording of the incident reflects that defendant sometimes sang, quoted movies, pleaded, cried, and often screamed in a non-sensical manner while at the jail.

Due to his behavior, defendant was transported to the Willamette Valley Medical Center. Defendant remained uncooperative, combative, and verbally attacked the officers with him, calling them terrorists. Defendant also stated that he

5      - OPINION AND ORDER

"didn't burn that mosque" and referred to himself as a Christian warrior. Eventually, he was given intravenous medications and discharged to the Yamhill County Jail.

Defendant's disruptive behavior continued at the jail during the early morning hours of December 15. Defendant accused his former wife of being a Muslim and kidnaping his son, referred to "fucking Muslim bastards" and the "fuckin mosque," and made repeated references to "jihad" among other comments, most of which were non-sensical. Defendant complained about his handcuffs and told the officers that he was paranoid and mentally ill. Defendant also asked for his lawyer on several occasions. Ultimately, defendant was released and returned to his home in Corvallis.

On December 16, 2010, defendant's mother called the police and reported that defendant was saying "weird" things and acting strangely. Defendant was transported to the Good Samaritan Regional Medical Center and released later that morning.

Later the same day, defendant's neighbors called the police due to defendant's behavior in his front yard. The neighbors reportedly saw him walking in the yard with a knife, while stating that he was being persecuted and retaliated against by others. When police officers arrived, they discovered that defendant had started a fire in a grill in the backyard and

constructed a shrine of objects on the front porch. Defendant was taken to Good Samaritan Hospital.

Shortly after defendant's admission to the hospital, police officers attempted to interview him. Fairly early in the interview, defendant pled "the Fifth" and requested his lawyer. Defendant also made numerous nonsensical comments, interspersed with references to Muslims, jihad, and terrorists. Defendant denied being involved in the mosque arson and referred to himself as the "fall guy." Defendant remained at Good Samaritan until January 14, 2011, when he was transferred to the Oregon State Hospital (OSH).

Defendant remained at OSH until April 27, 2011. He was diagnosed with psychosis, bipolar affective disorder, alcohol dependence, and polysubstance abuse.

The FBI lab in Quantico, Virginia conducted DNA analyses of the blue flashlight and bottle cap recovered from the arson scene. A DNA mixture was present on the flashlight; it was determined that defendant was a major contributor to the mixture, with odds of someone else being a major contributor as one in 3.7 million in the Caucasian population. A single source of DNA was found on the bottle cap and was found to be a

"virtual match" to defendant, with odds of the DNA belonging to someone else as one in 3.5 million in the Caucasian population.[1]

On August 24, 2011, a federal grand jury issued a two-count indictment charging defendant with the current offenses.

## DISCUSSION

Defendant seeks to suppress "any reference to any statements made by Mr. Crawford during the period of his psychotic break, along with any reference to the accompanying bizarre conduct." Def.'s Mot. at 15. In other words, defendant seeks to suppress everything he said or did from December 14, 2010 through April 2011. The government confines its response to specific instances of defendant's statements and conduct that occurred on December 14, 15, and 16, 2010. See Gov't Response at 6. Specifically, the government argues that the following evidence is admissible: 1) defendant's statements and conduct prior to and during his arrest in McMinnville on December 14, 2010; 2) defendant's statements made during the booking process at the Yamhill County Jail on December 14, 2010; 3) defendant's statements made to law enforcement officers at the Willamette Valley Medical Center during the early morning hours of December 15, 2010; and 4) defendant's statements made to law enforcement officers at his home and while at Good Samaritan Hospital on

---

[1] Defendant also challenges admission of the DNA evidence; an evidentiary hearing is scheduled in January 2015.

December 16, 2010, before invocation of his right to counsel.[2] The government represents that it will not seek to admit any statements made after defendant requested counsel on November 29 and December 16, 2010. Gov't Response at 19. I therefore limit this discussion to the evidence that the government presumably intends to introduce, as set forth above.

Defendant makes several evidentiary and constitutional arguments in support of his motion to suppress. First, defendant argues that his statements and conduct are not relevant to the charges against him under Federal Rule of Evidence (Rule) 401. Relying on expert medical reports and testimony, defendant argues that his statements and actions between December 2010 and April 2011 were delusional, disconnected from reality and irrational, rendering them irrelevant and unlikely to make any fact more probable than not. Second, defendant argues that his statements and conduct constitute impermissible character and propensity evidence under Rule 404(b). Third, defendant argues that any probative value of such evidence is outweighed by prejudice, confusion and waste of time under Rule 403, in that the jury might assume religious animus based on defendant's

---

[2]The government also intends to introduce defendant's statements made on November 29, 2010. Defendant does not seek to suppress these statements; rather, defendant argues that officers' conduct during his interview on that date contributed to his subsequent breakdown and rendered his statements involuntary under the Fifth Amendment.

9    - OPINION AND ORDER

statements and lengthy testimony would be required to explain defendant's mental state in December 2010.

With respect to his constitutional arguments, defendant argues that admission of his statements and conduct would deprive him of his due process right to a fair trial, in light of the unreliable and prejudicial nature of his behavior. Defendant also argues that his statements and conduct were involuntary and the product of police coercion, and that his statements on December 14, 2010 were elicited after he invoked his right to counsel. I first address the threshold constitutional arguments and then analyze the evidentiary objections.

## I.  Constitutional Arguments

### a. Fairness of Trial

Defendant argues that admission of his statements and conduct would violate his right to a fair trial under the Due Process Clause, because his statements and conduct are irrelevant and unduly prejudicial. Defendant contends that his alleged preoccupation with Muslims and Christianity and his impulsive behavior constitute inadmissible propensity evidence offered to show that he acted in conformity with his statements and irrational conduct.

Defendant cites McKinney v. Rees, 993 F.2d 1378 (9th Cir. 1993) for the proposition that admission of propensity evidence,

10      - OPINION AND ORDER

i.e., character or bad acts evidence, can violate a defendant's right to a fair trial. In McKinney, the defendant was charged with fatally stabbing his mother, and the trial court admitted evidence of the defendant's prior possession of and "fascination" with knives. Id. at 1382. The Ninth Circuit held that the defendant's prior possession of a knife was "irrelevant to any element of the prosecution's case" and permitted only one inference to be drawn by the jury – that the defendant "was the type of person who would own a knife." Id.

Here, the evidence is being offered for a permissible purpose and not simply to show propensity. The government is required to prove that defendant set fire to the mosque because of his feelings about Muslims. 18 U.S.C. § 247(c) (rendering it a crime to damage religious real property "because of the race, color, or ethnic characteristics of any individual associated with that religious property"). The government seeks to admit defendant's comments to show his intent and state of mind – not his propensity to commit arson or damage religious property generally.[3] Consequently, McKinney is readily distinguishable from this case and does not preclude admission of defendant's conduct and statements.

---

[3] For this reason, admission of such evidence is not barred by Rule 404(b). See Fed. R. Evid. 404(b)(2) (other acts evidence is permitted to show "motive, opportunity, intent, preparation, plan, knowledge").

In fact, the Ninth Circuit upheld the admission of "skinhead and white supremacist evidence" offered to establish the required element of racial animus in a case alleging interference with federally protected rights on the basis of race. See United States v. Allen, 341 F.3d 870, 886-88 (9th Cir. 2003). Similarly, the government here intends to introduce evidence of defendant's attitudes and paranoia regarding Muslims to show religious animus, a necessary element of a charged offense.

Defendant nonetheless argues that, if admitted, the unreliability of his delusional and irrational comments would compromise his ability to receive a fair trial. However, as recognized by the Supreme Court, statements made while in a psychotic state "might be proved to be quite unreliable, but this is a matter to be governed by the evidentiary laws of the forum . . . and not by the Due Process Clause of the Fourteenth Amendment." Colorado v. Connelly, 479 U.S. 157, 167 (1986). Indeed, defendant makes several evidentiary arguments, and they are addressed below in Section II. For purposes of the Due Process Clause, however, admission of defendant's statements and conduct does not violate his right to a fair trial.

b. Voluntariness of Defendant's Statements

Defendant next argues that any statements he made in police custody after November 29 were the product of police coercion.

12      - OPINION AND ORDER

Defendant contends that the conduct of police on November 28 and 29, combined with the official scrutiny of him during the next two weeks, caused his mental breakdown by "heighten[ing] the degree of anxiety, the degree of disruption in the predictability of Mr. Crawford's routine." Def.'s Mot. at 29. Thus, defendant maintains that his comments and conduct during that time were involuntary and a product of coercion. I am unpersuaded by this argument.

In assessing the voluntariness of a defendant's statement, the court looks at "the surrounding circumstances, the combined effect of the entire course of the officer's conduct upon the defendant." United States v. Polanco, 93 F.3d 555, 560 (9th Cir. 1996) (citation omitted). Under this standard, defendant is correct that a court must take into account a defendant's state of mind and determine whether law enforcement officers exploited a mental illness or impairment to elicit incriminating statements. See United States v. Preston, 751 F.3d 1008, 1016-17 (9th Cir. 2014) (the court must consider the totality of the circumstances, including a defendant's mental state or intellectual functioning, when determining whether a defendant's "will was overborne").

However, while a defendant's "mental condition is surely relevant to an individual's susceptibility to police coercion," "a defendant's mental condition, by itself and apart from its

13      - OPINION AND ORDER

relation to official coercion, should [n]ever dispose of the inquiry into constitutional 'voluntariness.'" Connelly, 479 U.S. at 164-65. Instead, the question is whether police conduct exploits a defendant's condition to the extent that the defendant's "will is overborne." See id.; Preston, 751 F.3d at 1028 ("[T]he officers' use of the methods employed here to confuse and compel a confession from the intellectually disabled eighteen-year-old before us produced an involuntary confession.").

The Supreme Court has emphasized that "coercive police activity is a necessary predicate to the finding that a confession is not 'voluntary' within the meaning of the Due Process Clause." Connelly, 479 U.S. at 167. "Only if we were to establish a brand new constitutional right — the right of a criminal defendant to confess to his crime only when totally rational and properly motivated — could respondent's present claim be sustained." Id. at 166. In sum, "[a]bsent police conduct *causally related* to the [defendant's statements], there is simply no basis for concluding that any state actor has deprived a criminal defendant of due process of law." Connelly, 479 U.S. at 164. The Supreme Court's reasoning applies with greater force in these circumstances, given that defendant did not confess to the crimes charged or otherwise implicate himself in their commission.

14    - OPINION AND ORDER

Thus, the fact of defendant's mental illness and psychotic breakdown on December 14, 2010 is not sufficient by itself to render his subsequent statements involuntary. Defendant also must show that the police officers' conduct was coercive and exploitive under the totality of the circumstances. Defendant fails to do so.

Notably, defendant admits that he was not delusional or in a psychotic state when he was questioned on November 28 and 29, 2010. Def.'s Reply Br. at 14, n.4. In fact, Dr. Scott Reichlin, a forensic psychiatrist, reviewed the recorded interview between defendant and Officer Poole on November 29 and opined:

> In the interview Mr. Crawford denied any involvement with the fire. He sounded calm, mentally organized, with rational responses to police questions, including one response in which he rationally and appropriately asked for an attorney, after officer Poole stated his belief that Mr. Crawford was responsible for the fire.

Def.'s Reply, Ex. I at 5 (under seal).

Thus, even though defendant accuses Officer Poole of heavy-handed tactics during his interview,[4] defendant made no incriminating comments and exhibited no symptoms or conduct that would have alerted officers to a potential psychotic breakdown or delusional state. Given the circumstances, it can hardly be

---

[4] I disagree that the tactics were necessarily coercive; Officer Poole told defendant that detectives would likely find defendant's fingerprints on the flashlight and discover other fingerprints of defendant as well, and that defendant could be arrested.

15    - OPINION AND ORDER

said that officers "exploited" defendant's mental condition on
November 29, particularly when he did not confess or incriminate
himself and instead invoked his right to counsel. Moreover,
other factors could have played a role in defendant's breakdown,
including his abuse of alcohol, the continuous media scrutiny,
and his familial relationships.[5] Thus, the causal connection
between the defendant's November 29 questioning and his
subsequent "involuntary" statements is tenuous, at best, if not
non-existent. Moreover, defendant identifies no police conduct
on December 14, 15, or 16 that could reasonably be considered
exploitive or coercive, and the record reflects none.

Consequently, defendant's statements and conduct are not
involuntary and inadmissible under the Fifth Amendment.

c. Statements After Invocation of the Right to Counsel

Defendant argues that law enforcement officers violated his
constitutional rights by questioning him after he invoked his
right to counsel on December 14 and 16, 2010. Defendant does not
identify the specific statements sought to be suppressed, other
than his various references to Muslims, jihad, being a Christian
warrior and the like.

---

[5] A defense expert also testified that defendant's psychotic
episode was not necessarily caused by one particular factor,
because those with bipolar disorder have manic episodes with or
without a particular stressor.

The government concedes that defendant invoked his right to counsel on November 29, 2010 while being questioned in his home and on December 16, 2010 at Good Samaritan Hospital. Accordingly, the government will not introduce statements made after defendant invoked his right to counsel on those dates. However, the government maintains that defendant's statements on December 14, 2010 were not elicited in response to police questioning and should not be suppressed on that ground. I agree.

On December 14, 2010, defendant was arrested and taken to the Yamhill County Jail after his reportedly bizarre and harassing behavior at a McMinnville gas station and video store. During the booking process, defendant requested his lawyer. The police officer ignored his request and continued with the booking process. Subsequently, the officer asked for defendant's address, phone number, and social security number. As the officer completed the booking process, defendant made numerous incoherent statements, including comments about Muslims, jihad, and Christianity. Defendant also requested his lawyer several more times. See generally Def.'s Motion, Ex. A.

Notably, the police officer did not question defendant about his behavior that evening or about the arson. Instead, the officer repeatedly stated that he was not questioning defendant and did not want him to admit to anything. Defendant fails to

17    - OPINION AND ORDER

identify one specific comment regarding Muslims or any other incriminating subject made in response to police questioning.

Based on the transcript and review of the recording, defendant's comments while at the Yamhill County Jail on December 14, 2010 were spontaneous and voluntary and did not violate his constitutional rights.

## II.  Evidentiary Arguments

Defendant argues that his comments and statements during his psychotic breakdown between December 2010 and April 2011 are not relevant to the charges against him, because they are unreliable and do not tend to make any fact more probable than not. Fed. R. Evid. 401. Defendant further argues that any probative value of his statements and conduct is outweighed by prejudice, confusion, and waste of time.[6]

The court typically resolves evidentiary objections in the context of a motion in limine filed shortly before trial, when the parties and the court have a better idea of what specific evidence is intended to be introduced at trial. At this stage of the proceedings, I am hindered in my ability to assess

---

[6] Defendant also argues his statements and conduct constitute impermissible propensity evidence under Rule 404(b), because they are not relevant to the charges against him. Given my finding that defendant's statements and conduct are relevant to his motive and intent, their admission does not run afoul of the prohibition against character or propensity evidence under Rule 404(b). Defendant's intent – an element of the crime - is of great consequence in determining defendant's guilt.

18    - OPINION AND ORDER

defendant's evidentiary objections, when it is unclear what evidence the government will offer to prove the charges against defendant. Given the facts presented, I am inclined to find defendant's statements relevant and generally admissible. However, I will allow defendant to renew his objections prior to or during trial.

In arguing that his statements and conduct are irrelevant to the charges against him, defendant relies on the opinions of a psychologist and forensic psychiatrist. Both experts testified that defendant was likely in the midst of a psychotic episode between December 2010 and April 2011, and his statements and conduct during that time likely did not reflect his usual, rational thoughts or his normal, daily activity. Accordingly, defendant argues that his statements and conduct during that time were not representative of his true mental state and are therefore irrelevant.

Evidence is relevant if "it has any tendency to make a fact more or less probable than it would be without the evidence" and "that fact is of consequence in determining the action." Fed. R. Evid. 401. As discussed above, the government must establish that defendant intentionally damaged the mosque "because of the race, color, or ethnic characteristics of any individual associated with that religious property." 18 U.S.C. § 247(c). Defendant's comments about the mosque, Muslims, jihad, and being

19    - OPINION AND ORDER

a Christian warrior have some tendency to make the fact of religious animus more or less probable than it would without such evidence. See Allen, 341 F.3d at 887-88 (evidence of white supremacist beliefs was relevant and admissible to prove the defendant's racial animus). Defendant's comment, "You will never know the truth about the mosque," and other comments referencing the mosque are particularly relevant and lend relevance to defendant's other statements about Christianity, Muslims, and jihad.

Defendant nonetheless argues that the unreliability of his statements diminishes their relevance, as statements uttered in the midst of his psychotic breakdown cannot be found to accurately reflect his state of mind. Indeed, defendant's experts testified that it was virtually impossible to determine whether defendant's comments during December 14-16 accurately reflected his thoughts, beliefs, or state of mind at the time. Specifically, defendant's experts testified that statements made during a psychotic episode can be nothing more than nonsense unrelated to underlying thoughts or beliefs, or such statements can reflect past experiences or present thoughts. The defense experts further testified that they were unable to interpret the meaning of defendant's comments or draw any conclusions from them, in light of his mental state at the time. Dr. Reichlin testified that one would need to speak with defendant when he is

20    - OPINION AND ORDER

stable to ascertain his true beliefs about Muslims and Islam. In essence, defendant's experts maintain that there is no way to determine, with any certainty, which of defendant's statements reflect his actual beliefs.

However, Dr. Reichlin also testified that prior, non-psychotic statements tend to afford greater reliability to subsequent statements made during a psychotic episode, if the statements are consistent. Further, the government's expert testified that verifiable facts or opinions are commonly interspersed amongst nonsensical statements made during a psychotic episode. In other words, defendant's comments about Muslims and religion could have reflected his true beliefs at the time, or they could have been nothing more than random outbursts untethered to his actual thoughts or beliefs. Thus, the issue becomes whether the jury should be allowed to assess the reliability of defendant's statements when expert psychiatrists and psychologists are unable to do so.

I tentatively find that the issue of reliability in this context is better presented to the jury, with the aid of expert testimony. See Fed. R. Evid. 702(a) (permitting expert testimony that "will help the trier of fact to understand the evidence or to determine a fact in issue"). I am persuaded by the expert testimony explaining that the reliability of statements made during a psychotic episode depends in large part on other

21      - OPINION AND ORDER

evidence that either verifies or refutes the subject matter of the statements. Should the government present other evidence suggesting religious animus or paranoia on defendant's part, his statements and conduct become decidedly more relevant.

Notably, the jury is not being asked to assess the reliability of expert testimony, such that the court's gate-keeping function comes into play. Kumho Tire Co., Ltd. v. Carmichael, 526 U.S. 137, 147 (1999) (trial court's gate-keeping function applies to all expert testimony); Daubert v. Merrell Dow Pharm., Inc., 509 U.S. 279 (1993). Further, the reliability or accuracy of a defendant's statements is commonly within the province of the jury. Therefore, at this stage of the proceedings, I am not inclined to find defendant's conduct and statements irrelevant to the charges against him.

Despite their presumed relevance, I must also consider whether the probative value of defendant's statements and conduct is outweighed by other factors under Rule 403. Defendant maintains that the probative value is outweighed by prejudice, in that the jury may believe he is the type of person who would commit arson at a mosque despite the lack of evidence connecting him to the crime. Defendant also argues that the likelihood of confusion and waste of time weighs against admission, in that a "mini-trial" about his state of mind would ensue.

22    - OPINION AND ORDER

I am not persuaded that admission of defendant's statements and comments is unduly prejudicial. As defendant points out, he has never admitted liability or actually incriminated himself, and his statements are amendable to varying interpretations and inferences. While I agree with defendant that admission of his statements and conduct would likely result in lengthy testimony regarding his state of mind and mental condition, I cannot find that such "waste of time" outweighs the probative value of his statements, particularly those referencing the mosque.

That said, the entirety of defendant's comments made while at the Yamhill County Jail and the Good Samaritan Hospital are arguably cumulative and could constitute a waste of time in light of their seemingly negligible probative value. As reflected by the video and audio recordings, defendant's comments about Muslims, jihad, etc., were virtually indecipherable and sparsely interspersed amongst a tirade of non-sensical screaming and shouting. The probative value of these statements is minimal, depending on the nature of other evidence presented at trial. I recognize that the government does not intend to admit defendant's statements made after he requested counsel on December 16. At the same time, I am not inclined to admit all of defendant's remaining statements at the jail and hospital absent other evidence bolstering their probative value.

23      - OPINION AND ORDER

In sum, I cannot make a final ruling on defendant's Rule 401 and 403 objections until the case proceeds to trial. Generally, I find that defendant's comments are relevant, and I do not find suppression or exclusion appropriate at this juncture. However, prior to trial defendant may renew his Rule 401 and 403 objections in light of specific evidence the government intends to present at trial.

CONCLUSION

Defendant fails to show that introduction of his conduct and comments at issue would violate his constitutional rights. Defendant's comments are relevant to motive and intent, and they were voluntary and not a product of police coercion. Further, the government will not introduce defendant's statements made after he invoked his right to counsel on November 29 and December 16, 2010. The court cannot render a final ruling on the relevance of defendant's statements and their probative value until the case proceeds to trial. Accordingly, defendant's Motion to Suppress (doc. 55) is DENIED, with leave to renew on evidentiary grounds at the time of trial.

IT IS SO ORDERED.

Dated this 7th day of November, 2014.

Ann Aiken
United States District Judge