**Bryan E. Lessley**
**Assistant Federal Public Defender**
**859 Willamette Street, Suite 200**
**Eugene, OR  97401**
**(541) 465-6937 Telephone**
**(541) 465-6975 Facsimile**
**Bryan_Lessley@fd.org**

**Attorney for Defendant**

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF OREGON

## EUGENE DIVISION

| | |
|---|---|
| **UNITED STATES OF AMERICA,** | **No. 6:11-cr-60097-AA-1** |
| **Plaintiff** | **DEFENDANT'S AMENDED SUPPLEMENTAL MEMO REGARDING SUPPRESSION OF DNA EVIDENCE** |
| **v.** | |
| **CODY CRAWFORD,** | |
| **Defendant.** | |

# TABLE OF CONTENTS

**Page**

Table of Authorities ...................................................................................................... iii

INTRODUCTION ............................................................................................................ 1

I.     The Chain Of Custody Of The Bottle Cap Is Broken Beyond Repair. It Is Not Possible To Answer Even Fundamental Questions About Its Course Of Handling.  The Government Cannot Show That A Bottle Cap Was Seized At The Scene Of The Fire, Or That The Bottle Cap Found Later At The FBI Laboratory Had Any Connection To The Crime Scene.  The Government Also Cannot Show That The Bottle Cap At The FBI Lab Was Not Contaminated Because Of The Way It Was Handled............................................. 3

     A.     It Is Not Possible To Determine Who Opened Exhibit Q3 At The FBI Laboratory, Or When, Or How Many Times It Was Opened. ............ 3

          1.     While Reviewing Flaws In The Laboratory Documentation, It Is Important To Remember That There Is No Contemporaneous Record Of A Bottle Cap Being Collected At The Crime Scene In The First Place. ........................................ 3

          2.     FBI Laboratory Documentation Does Not Show That The Bottle Cap Found In Connection With The Q3 Exhibit Had Anything To Do With The Crime Scene.  The Government's Document Trail Shows Serious Gaps In The Handling Of The Q3 Exhibit Such That It Is Not Possible To Say Even Who Opened The Exhibit, Or When, Or How Many Times It Was Opened............................................................................... 6

               a)     There Is No Record of JTP2-B:3 Being Inventoried Or Labeled As Q3 At The FBI Laboratory. There Is Also No Record Of Who Assigned The Q-Numbers To Any Of The Exhibits. .................................................... 7

               b)     The Evidence Item Itself – Q3 – Shows Markings That Are Inconsistent With Other Records.  Q3 Has Many Initials Written On It By People Who Handled It With No Reference To Dates And No Explanation Of What They Did. ........................................................... 8

               c)     There Are Other Gaps In The Chain Of Custody Logs For Q3. ..................................................................... 12

   d) Inconsistent Descriptions Make It Hard Even To Know What The Exhibit Contained................................. 13

  B. In Trying To Establish That The Bottle Cap Found At The FBI Laboratory Was The One Seen At The Crime Scene, The Government Fails To Show The Condition Of The Bottle Cap When It Was Found........................................................................... 14

  C. James Evans Had Simultaneous Custody Of Both Q3 And Cody Crawford's DNA Sample........................................................ 16

II. THE FBI LABORATORY'S PRACTICES WITH REGARD TO THE MAGLITE SUFFERED INCONSISTENCIES IN THE RECORDS, UNEXPLAINED CHANGES TO RECORDS, AND LACK OF AN IDENTIFIABLE AND RETRACEABLE COURSE OF HANDLING, SUCH AS TO RENDER THAT EVIDENCE INADMISSIBLE........................ 18

  A. The Government's Own Expert Explained That Laboratory Records Are Kept In Such A Way That accurate Contemporaneous Records Are Overwritten After The Fact And Replaced By Inaccurate Ones. ........................................................................................................ 19

  B. In Explaining The Processing Of The Maglite, The Government Takes A Position About Its Recordkeeping Practices That Is Directly Contradictory To The Government's Position With Regard To The Bottle Cap.................................................................................. 21

  C. The FBI Laboratory Also Used Inconsistent Practices So That The Same Terms Were Given Different Interpretations By Different Recordkeepers. Making It Impossible To Know Exactly What Was Done On What Date................................................................................. 23

III. BREAKS IN THE CHAIN OF CUSTODY AND IRREGULARITIES IN THE HANDLING OF THE EVIDENCE ITEMS RENDERS THEM INADMISSIBLE UNDER BOTH DAUBERT AND RULES 901 AND 403............................................................................................................................ 23

## TABLE OF AUTHORITIES

**Page**

### FEDERAL COURT CASES

*Daubert v. Merrill Dow Pharmaceuticals, Inc.,*
509 U.S. 579 (1993).................................................................................................. 3

*Gallego v. United States,*
276 F.2d 914 (9th Cir. 1960) ........................................................................... 16

*United States v. Harrington,*
923 F.2d 1371 (9th Cir. 1991) ........................................................................ 16

*United States v. Lampson,*
627 F.2d 62 (7th Cir. 1980) ............................................................................ 16

*United States v. Solorio,*
669 F.3d 943 (9th Cir. 2012) .......................................................................... 16

## INTRODUCTION

Defendant Cody Crawford has moved to suppress evidence relating to DNA testing of two items, a bottle cap and a Maglite flashlight.  After pre-hearing briefing, an evidentiary hearing took place on his motion on January 6, 2015, after which the court ordered supplemental briefing.

Taking the bottle cap first, Mr. Crawford claims that the chain of custody of the item, both from the time of its supposed collection at the scene of the crime, through its supposed analysis at the FBI laboratory in Virginia, is irretrievably broken.  The evidence adduced at the hearing completely failed to answer gaps in the handling and chain of custody of the item; indeed, the hearing testimony exposed even more gaps that had been pointed out before.  Because the court at the end of the hearing posed some basic questions, the defense has performed additional investigation, to be discussed herein.  That investigation, unbelievably, reveals still more gaps in the record regarding the handling of the item.  The conclusion seems inevitable that fundamental questions about the chain of custody of the JTP2-1B:3-Q3 exhibit can never be answered.

Primarily the court posed these questions:

Well, I am going to tell you some gaps that I see in this record right now that have some problems, and I am going to ask for supplemental briefing because this isn't just a perfunctory issue.

So we are trying – I have been trying to follow just the details of some basics.

So where in the record does it say when and – when and where was JTP2-1B3-Q3 bag unsealed by the FBI?  Is that answered in this record? Has that been made clear? If I have missed it, please tell me.

Which office actually placed the bottle cap in the bag in the first place? Do we have – is that noted in this record?

There's some reference to Poole. Was it Poole?  Do we have anything documenting that?  His report indicates that he left it in the bag but not that he placed it there.

Page 1 DEFENDANT'S AMENDED SUPPLEMENTAL MEMORANDUM REGARDING SUPPRESSION OF DNA EVIDENCE

* * *

So I am tipping my hand, and I am going to ask for supplemental briefing because I don't think, now that I have whatever testimony was offered today, what I have on the record, that it's adequately answered by your briefing.

Tr. 150-151.[1]

The answer is – it is not possible based on the documentation in the record to determine when the exhibit was first opened, or how many times, or by who. There is also no contemporaneous record of anyone putting the bottle cap into the bag. As just noted, the defense efforts to address these questions have revealed even more gaps and questions about the handling of the evidence, not fewer.

Similarly, with regard to the Maglite, Mr. Crawford's earlier briefing pointed out inconsistencies in FBI laboratory documentation that called into question exactly how and when certain testing was done.  As with the bottle cap, it turns out that Mr. Crawford's pre-hearing briefing actually understated the inconsistencies in the laboratory documentation.  In addition to the laboratory flaws pointed out by Mr. Crawford in his earlier filings, there were additional major flaws revealed by the testimony at the hearing.

As Mr. Crawford's original motion and briefing pointed out, these failures are not just traditional chain-of-custody issues under Rule 901 of the Rules of Evidence. Def. Mot. at 27-33.[2] Certainly, at least with the bottle cap, the evidence should be suppressed under that Rule. But the

---

[1] The reference "Tr." refers to the transcript of the evidentiary hearing occurring on January 6, 2014.

[2] The earlier pleadings referred to herein include the Defendant's Motion To Suppress The Results Of DNA Testing ("Def. Mot."), the United States' Amended Response To Defendant's Motion To Suppress The Results Of DNA Testing ("Gov. Resp.") and the Defendant's Reply To Government's Response To Motion To Suppress The Results Of DNA Testing ("Def. Reply").

Page 2 DEFENDANT'S AMENDED SUPPLEMENTAL MEMORANDUM REGARDING SUPPRESSION OF DNA EVIDENCE

failure to use acceptable and reliable laboratory methodology also renders the items inadmissible under *Daubert v. Merrill Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993) and Rule 702.  Def. Mot.at 19-26.

**I.      The Chain Of Custody Of The Bottle Cap Is Broken Beyond Repair. It Is Not Possible To Answer Even Fundamental Questions About Its Course Of Handling.  The Government Cannot Show That A Bottle Cap Was Seized At The Scene Of The Fire, Or That The Bottle Cap Found Later At The FBI Laboratory Had Any Connection To The Crime Scene.  The Government Also Cannot Show That The Bottle Cap At The FBI Lab Was Not Contaminated Because Of The Way It Was Handled.**

**A.      It Is Not Possible To Determine Who Opened Exhibit Q3 At The FBI Laboratory, Or When, Or How Many Times It Was Opened.**

The documentary trail regarding the bottle cap does not show when the evidence bag containing the bottle cap was opened, or by whom, or how many times. Indeed, counsel's attempts to answer that question show that Mr. Crawford's earlier filings actually understate the deficiencies and inconsistencies in the record regarding the handling of the bottle cap.  In preparing this Supplemental Memorandum, Mr. Crawford has found even more gaps and inconsistencies in the FBI records than had been revealed before.

**1.      While Reviewing Flaws In The Laboratory Documentation, It Is Important To Remember That There Is No Contemporaneous Record Of A Bottle Cap Being Collected At The Crime Scene In The First Place.**

In order to place the issue of the opening of the exhibit into context, it helps to remember that there are two kinds of deficiencies in the record regarding the bottle cap.  The first area of deficiency concerns the collection of a bottle cap at the scene by the Corvallis Police Department. The second concerns the handling of evidence items at the FBI laboratory.  The remarkable feature of the case is that the record is grossly lacking and inconsistent in both respects.

Page 3 DEFENDANT'S AMENDED SUPPLEMENTAL MEMORANDUM REGARDING SUPPRESSION OF DNA EVIDENCE

The evidentiary hearing primarily focused on the FBI laboratory, largely because the government has not disputed the factual portrayal made by Mr. Crawford in his earlier briefing and Exhibits concerning the supposed collection of the evidence by the Corvallis Police Department.  See Def. Motion at 4-8, Def. Reply at 2-3. Those are reviewed here for context only and because the court asked a question about who put the bottle cap into the bag.

The answer is, it is not possible to determine who, if anyone, put a bottle cap into a bag at the crime scene because there is no contemporaneous record of a bottle cap being collected at all. Essentially, Corvallis police Sergeant Jeff Van Arsdall saw a white bottle cap at the scene of the Mosque fire and claims to have collected it.  Thereafter, not one single record exists to show the collection or processing of such an item.  Although the item is mentioned in several reports, and there are narratives claiming that the bottle cap was collected, those narratives are all inconsistent with the physically demonstrable paper trail and are largely after-the-fact rationalizations. (E.g., Def. Exhs. A-3, X). Van Arsdall's report says "I placed each item of evidence in its own bag." (Def. Exh. A-2 at 1). He did not. There is no evidence bag referencing a bottle cap, nor does a bottle cap appear in any evidence log.[3]    Officer Jeremy Parrish wrote a report claiming to have taken a photograph of the bottle cap.  He did not. The only picture in which anything remotely resembling a bottle cap appears shows it at an accidental corner of the photograph, partially obscured. (Def. Exh. D). Sergeant Van Arsdall gave the items he collected to Officer Greg Blount

---

[3] Even Sergeant Van Arsdall's after-the-fact attempts at explanation fail to establish that he collected the bottle cap or what he did with it.  On September 11, 2014 – almost four years after the fire – Sergeant Van Arsdall was interviewed by the about the bottle cap.  Agent Soule's report states that "With regard to the collection of evidence at the scene, Sgt. VAN ARSDALL could not specifically recall whether the two liter Fanta bottle and the bottle cap were placed in the same evidence bag."  (Def. Exh. A-3).

Page 4 DEFENDANT'S AMENDED SUPPLEMENTAL MEMORANDUM REGARDING SUPPRESSION OF DNA EVIDENCE

for cataloging.  Officer Blount's evidence log shows no bottle cap. (Def. Exh. A). The Fanta bottle and the paper bag it had been placed in were taken to the Corvallis Police Department for processing by Officer Jeremy Parrish.  Officer Parrish emptied the bag, noting in his log that it contained the bottle and some "burned residue." (Def. Exh. B). He removed the label from the bottle and logged the label, the bottle, and the bag, as separate evidence items, including making a specific reference to the pieces of burned residue in his evidence description. (Def. Exh. B). There was no bottle cap.

In short, as Mr. Crawford has pointed out in previous pleadings, there is not one single record showing the collection and cataloging of a bottle cap as an evidence item at the scene of the fire.  The written narrative reports mentioning the bottle cap are not consistent with the documentation of the case. The government relies on after-the-fact explanations by the officers about what they think they did, but the government does not and cannot dispute that the documentary trail does not show a bottle cap ever having been collected as an item of evidence at the scene of the fire.

The government's own expert agrees that reliance on after-the-fact memories of what might have happened is not an acceptable practice.  Government laboratory proficiency expert Amber Carr testified as follows:

> Q.      … Is it considered to be a good laboratory practice to have a defined document trail so that steps that are taken can be retraced later?
>
> A.      Yes, definitely.
>
> Q.      Okay.  And so that the work that is done can be documented for future reference without having to rely on people's individual memories or reconstructed memories from later but you create a document trail at the time, correct?

Page 5 DEFENDANT'S AMENDED SUPPLEMENTAL MEMORANDUM REGARDING SUPPRESSION OF DNA EVIDENCE

A.      That is correct, yes.

Tr. 64.  Despite this testimony from its own witness, the government's claim that a bottle cap was collected at the scene relies solely and exclusively on reconstructed memories.

The primary focus of the evidentiary hearing, and the primary thrust of the court's question about when and where the evidence bag was opened, has to do with the second area of deficiency in recordkeeping, relating to the discovery of a bottle cap at the FBI laboratory and the later DNA testing performed on it.  The government's essential theory is that the bottle cap may have been placed by someone into the same paper bag as the Fanta bottle at the scene of the fire, even though Van Arsdall's report, written at the time, says he placed each item in separate bags.  The government then suggests that when officer Parrish opened the bag, removed the bottle, and saw pieces of "burned residue" in the bag, that there was a bottle cap there as well even though he did not see it.

> **2.** **FBI Laboratory Documentation Does Not Show That The Bottle Cap Found In Connection With The Q3 Exhibit Had Anything To Do With The Crime Scene.  The Government's Document Trail Shows Serious Gaps In The Handling Of The Q3 Exhibit Such That It Is Not Possible To Say Even Who Opened The Exhibit, Or When, Or How Many Times It Was Opened.**

In answer to the court's other specific question, there is no possible way to know who opened the evidence item at the FBI lab, or how many times it was opened, or under what circumstances. The few things that are not disputed about the FBI's handling of the evidence can be stated in one paragraph. The Fanta bottle was put in to a paper bag at the crime scene and was taken to the Corvallis Police Station, where it was opened, its contents viewed, and recorded on an evidence log as JTP2 ("Bag w/burned residue originally holding JTP3")(Def. Exh. B) It was

Page 6 DEFENDANT'S AMENDED SUPPLEMENTAL MEMORANDUM REGARDING SUPPRESSION OF DNA EVIDENCE

relabeled by FBI Special Agent Craig G. Mueller as Exhibit 1B1:3 when he sent it, unopened, to the FBI laboratory on November 29, 2010. That is the extent of what can be said clearly. Everything about its handling after that point is a matter of confusion.

The following questions are unexplained in the documentary record. Some of these have been discovered, as noted, since the evidentiary hearing. Attached hereto are additional Exhibits documenting the new deficiencies in the government's record.

> a)      **There Is No Record of JTP2-B:3 Being Inventoried Or Labeled As Q3 At The FBI Laboratory. There Is Also No Record Of Who Assigned The Q-Numbers To Any Of The Exhibits.**

The record does not establish even so much as who at the FBI lab opened the box in which JTP2-1B:3 was shipped, who labeled the exhibit as Q3, or what kind of inspection that person performed. This is one of the new deficiencies found by the defense in attempting to answer the court's question posed at the hearing.

The FBI chain of custody logs show that four boxes were received by the FBI laboratory from Oregon on November 30, 2010 and were initially placed in the storage area of the Explosives Unit. (Def. Exh. K at 1). All four boxes were retrieved from there by Robert P. Rooney on December 3. (Def. Exh. K at 1). However – and this is newly discovered – Mr. Rooney's inventory notes from that date only show him opening and inventorying three of the boxes. His notes do not show that he opened the box that contained JTP2-1B:3.

Mr. Rooney's inventory log is attached hereto as Defense Exhibit Y. By way of reference, Oregon FBI custody logs show that the paper bag, then numbered 1B:3, was shipped to the FBI laboratory with Fed. Ex. Tracking number 9623 8743 1805 (Def. Exh. H at 3). Mr. Rooney's inventory notes show that tracking number as one of the four boxes he received. (Def. Exh. Y at

Page 7 DEFENDANT'S AMENDED SUPPLEMENTAL MEMORANDUM REGARDING SUPPRESSION OF DNA EVIDENCE

1).  The ensuing pages of inventory notes only show him inventorying three of the boxes, not 9623 8743 1805. (Def. Exh. Y at 1-3).  If Rooney did not open the box and assign the number Q3 to it, there is no record of who did.  If he did open it, he made no record of doing so.

Rooney's notes do not show that he assigned any Q-numbers to any Exhibits.  His notes, to the contrary, continue to reference all the items by the "1B" numbers assigned in Oregon. (Def, Exh. Y at 1-3).  Although the FBI laboratory chain of custody records show the Q-numbers being used beginning on December 7, there is no record of who assigned the numbers, or what that person did with any of the Exhibits.

> **b)** **The Evidence Item Itself – Q3 – Shows Markings That Are Inconsistent With Other Records.  Q3 Has Many Initials Written On It By People Who Handled It With No Reference To Dates And No Explanation Of What They Did.**

In trying to determine who opened Q3, or when, or how many times, an obvious place to look is at the Exhibit itself.  Presumably if someone opened an exhibit they would write their initials and the date on the exhibit and make a report of what they did. The defense has looked at Q3 as well as looking at the pictures of Q3 that are in evidence (Def. Exh. Q). Comparison of the actual appearance of Q3 to the documentary record of its handling reveals contradictions, inconsistencies, and seemingly unanswerable questions.

Q3 shows a significant number of markings, prominent among them a host of initials placed all over the package.  Most of those initials are accompanied by no dates or other explanation – they are simply initials with no explanation why they are there or what they mean.  Yet trying to make sense of them shows a number of things that seem contradictory to other records, or, at least, things that raise questions about how the item was handled, and by whom.

Page  8 DEFENDANT'S AMENDED SUPPLEMENTAL MEMORANDUM REGARDING SUPPRESSION OF DNA EVIDENCE

The contradictions, inconsistencies and seemingly unanswerable questions are of five kinds. First, it was just noted that Rooney's inventory notes do not show that he opened the box in which Q3 had been shipped from Oregon.  Yet physical observation of Q3 shows his initials on the evidence item appearing immediately above the FBI laboratory number that was assigned to the investigation along with the designation "Q3" which was the FBI laboratory number assigned to what had formerly been 1B:3.  This is how the Exhibit appears:



(Def. Exh. Q at 6). Those numbers appear to be in the same pen as his initials. Thus the appearance of the Exhibit would seem to indicate that he inventoried it and gave it the number Q3; his notes, however, at least by negative implication, would show that he did not.

Second, the initials of W. Mark Whitworth, a Supervisory Special Agent in the Explosive Unit, appear at least three times on Q3.  Yet Agent Whitworth is never recorded in any chain of custody log as ever having had possession of Q3. He filed an affidavit (Gov. Exh. 2) explaining that it was he who handled and inspected Q3 on October 17, 2011, at a time when it was logged out to Explosives Unit Physical Scientist James J. Evans. (Gov. Exh. 10 at 2).  But even accepting

Page  9  DEFENDANT'S AMENDED SUPPLEMENTAL MEMORANDUM REGARDING SUPPRESSION OF DNA EVIDENCE

that he handled the item on that date, even though there is no evidence log showing that he did so, this does not explain why his initials are on the item multiple times.  Here they are:



(Def. Exh. Q at 6, 7).  Moreover, it is known that Special Agent Whitworth opened Exhibit Q3 on October 17, 2011, because he his affidavit identifies himself as the person who wrote the following on an Explosives Unit Note bearing that date:

CONTAINS PLASTIC MELTED PIECES AND A SCREW TOP PLASTIC BOTTLE TOP.  CHECKED WITH NDNA EXAMINER EBERTS AND WAS ADVISED THAT IT WOULD NOT BE A GOOD DNA SOURCE   W   10/17/11

(Def. Exh. L at 3; Gov. Exh. 10 at 2).  Notably, again, the item was not checked out to him – his inspection occurred while the item was checked out to James Evans, so Whitworth's name does not appear in any chain of custody log.  But the point here is that, even though Whitworth is demonstrated to have opened the Exhibit, his initials on the Exhibit do not bear a date or explanation.  His initials look just the same as a large number of other undated, non-explanatory initials.  The lack of a protocol for noting on the exhibit that someone has opened it makes it impossible to tell how many of the people who initialed the Exhibit at other unknown times and

Page 10 DEFENDANT'S AMENDED SUPPLEMENTAL MEMORANDUM REGARDING SUPPRESSION OF DNA EVIDENCE

dates might also have opened it. For that matter, the lack of a protocol does not eliminate the possibility that someone might have opened the Exhibit without making any initial at all.

Third, the custody logs show Robert Rooney in possession of the item on multiple occasions, yet his initials appear on Q3 only once.

Fourth, by contrast to the third point just made, there are many initials appearing on Q3 that do not correspond with anyone whose name or initials ever appear in any custody log. For example, the initials "CAPP" or "CARP" appear on Q3 at least twice and possibly as many as four times (handwriting is hard to interpret):



(Def. Exh. Q at 6, 7). Yet no "CAPP" or "CARP" appear in any chain of custody log.[4] The same appears to be true of other initials appearing on Q3.

Fifth, there are many more instances when physical examination of Q3, and attempting to compare it to other records, simply leaves questions. There are a lot of initials on Q3 that are indecipherable. There are people who are shown by the chain of custody logs to have had possession of Q3 multiple times, such as James Evans, whose initials are hard to find on the item at all.

---

[4] The complete chain of custody logs for Q3 at the FBI laboratory appear as Defense Exhibit K and as newly submitted Defense Exhibit Z. The newly submitted documents are the custody logs for Q3 during the period of its resubmission to the laboratory from February 9, 2012 until July 24, 2012. Exhibit Z includes FBI Latent Print Unit records.

There is no clear explanation for why someone would put his or her initials on the item without also writing a date. There is no clear explanation for what the presence of initials is supposed to mean.  Some of the initials appear over pieces of tape. Does that mean the person opened and then re-sealed the exhibit and then initialed on top of the tape? Or is that simply the random place where they placed their initials?

In short, based on the number of initials appearing on Q3, it would seem that the chain of custody logs are clearly an incomplete record of who handled or had custody of Q3, or how many people did, or when, or why. Notably no record or report ever shows who opened it for the first time at the FBI lab, or how many times it was opened, or by whom.  All that can be said is that a lot of different people handled it, not many of whom have been identified, a lot of people initialed the item as having possessed it, not all of whom have been identified, and very few of whom put a date with their initials.

### c)  There Are Other Gaps In The Chain Of Custody Logs For Q3.

At the hearing it was shown that there was a gap in the chain of custody log for Q3 between December 7, 2010 and February 23, 2011.  That is, on December 7, 2010, custody of Q3 was transferred from James Evans to a person whose initials begin with "M." On February 23, 2011, Robert Rooney transferred custody from himself back to James Evans.  Here are the two records:



Page 12 DEFENDANT'S AMENDED SUPPLEMENTAL MEMORANDUM REGARDING SUPPRESSION OF DNA EVIDENCE

(Def. Exh. K at 2, 4).  There is no accounting for when, or how, or where Q3 went from "M" to Rooney during the two and a half months between December 7 and February 23, or what was done with it in the meantime.  As an aside, it does not seem that the "M" person initialed Q3, although, as noted, some of the handwritten initials are hard to interpret.

### d)    Inconsistent Descriptions Make It Hard Even To Know What The Exhibit Contained.

Mr. Crawford complained at the hearing about the existence of multiple documents bearing the same date but containing different information, including different descriptions of what Q3 even contained.  The example about which there was testimony at the hearing centered around Defense Exhibits N, O-1 and O-2.  Those Exhibits are three versions of a nearly identical letter, all bearing the same date, addressee and title, which describe the Exhibit in three different ways.  Exhibit N describes the Exhibit as.

Q3   Bag and screw top (Your 1B3, E4413930)

Exhibit O-1 describes it as:

Q3    Screw top (Your 1B3, E4413930)

Q3.1   Melted piece of plastic (Your 1B3, E4413930)

Exhibit O-2 describes it as:

Q3   Bag and screw top (Your 1B3, E4413930)

Q3.1   Melted piece of plastic (Your 1B3, E4413930)

Then – and this is another new discovery since the hearing -- there is the description appearing in the Latent Print Unit report:

Q3 – brown paper bag is not evidence (see ACL)

Q3.1 – consists of two pieces of melted plastic

Page  13 DEFENDANT'S AMENDED SUPPLEMENTAL MEMORANDUM REGARDING SUPPRESSION OF DNA EVIDENCE

(Def. Exh. Z at 4). There is, of course, no record of who created the separate enumeration "Q3.1," or when. The designation just seems to appear without any report saying who created it or what it was. The latent print report states that "No latent prints detected on Q3-Q3.1." (Def. Exh. Z at 4). But then, according to the Latent Print Unit, all they tested was a bag that wasn't in evidence and a couple of pieces of plastic. They have no record of a bottle cap being part of Q3 at all.

In summary, at the conclusion of the hearing the court asked the parties whether it is possible to determine who opened Q3. By implication, the question extends to when, where, under what circumstances, how many times, and, most particularly, whether there is a verifiable trail showing any of that information. The emphatic answer is that the documentary trail created by the FBI makes it impossible to answer any of those questions.

**B.    In Trying To Establish That The Bottle Cap Found At The FBI Laboratory Was The One Seen At The Crime Scene, The Government Fails To Show The Condition Of The Bottle Cap When It Was Found.**

The government claims that the bottle cap found in the paper bag in Exhibit Q3 at the FBI laboratory was the same bottle cap that Van Arsdall observed at the scene of the Mosque. As noted extensively in previous briefing, and again above, the chain of custody and documentation that the government puts forward is wholly inadequate to support that conclusion. But the government also faces another obstacle in making its claim. The bottle cap photographed at the scene was stark white, as near as can be told from the inadequate photograph. But the bottle cap now is covered with gray staining and looks nothing like the one that appears in a corner of a photograph at the scene. The government has no record of the condition it was in at any given time in between.

Here is a blowup of the picture from the scene:

Page 14 DEFENDANT'S AMENDED SUPPLEMENTAL MEMORANDUM REGARDING SUPPRESSION OF DNA EVIDENCE



(Def. Exh. D).

This is its condition now, after processing by the FBI laboratory:



(Def. Exhs. Q at 7; Q-1) (Q-1 is new).

FBI Special Agent William Soule testified at the evidentiary hearing. He agreed that, to the extent that a partially obscured bottle cap shows in a corner of a picture from the crime scene, it appeared to be white in color. Tr. 29. Special Agent Soule also agreed that it appeared to be "kind of clean." Tr. 29. The picture itself shows the bottle cap to be completely white.

After Whitworth's October 17, 2011 inspection at the FBI laboratory, Exhibit Q3 was sent back to the FBI office in Oregon on November 4, 2011, where it remained in storage until Special Agent Soule removed it for visual inspection on January 20, 2012. (Def. Exh. H at 3). He agreed that at that time the bottle cap "did have some gray discoloration at the top," though he did not recall any discoloration on the sides. (Tr. 32-33). There is more discoloration now, which he attributes to the item having been processed at the FBI laboratory. (Tr. 32). There does not seem

Page 15 DEFENDANT'S AMENDED SUPPLEMENTAL MEMORANDUM REGARDING SUPPRESSION OF DNA EVIDENCE

to be any record, other than Agent Soule's reconstructed memory, of the condition of the item in

October 2011 at the FBI laboratory or in January 2012 when it was back in Oregon. Its condition

would be potentially meaningful in terms of whether the item found at the laboratory was the same

as the item observed at the scene because, had it simply sat in a bag the whole time, one would not

have expected its condition to change.

The Ninth Circuit has recently reiterated that, in cases where the challenge to the chain of

custody goes to the admissibility of evidence and not simply the weight,

> before such evidence can be admitted, "[t]he prosecution must introduce sufficient
> proof so that a reasonable juror could find that the items [that the prosecution seeks
> to admit into evidence] are in 'substantially the same condition' as when they were
> seized." … In other words, "[t]he district court may admit the evidence if there is a
> 'reasonable probability the article has not been changed in important respects.' ".

*United States v. Solorio*, 669 F.3d 943, 954 n. 13 (9th Cir. 2012), *citing United States v.*

*Harrington*, 923 F.2d 1371, 1374 (9th Cir. 1991) and *Gallego v. United States*, 276 F.2d 914, 917

(9th Cir. 1960).  Here, the condition of the item is not important simply to establish whether testing

done on the item is reliable – it is important because it calls into question the identity of the item

itself. Courts "exercise greater care in deciding admissibility when the issue concerns the identity

of the evidence, rather than just possible changes in its condition." *United States v. Lampson*, 627

F.2d 62, 65 (7th Cir. 1980).

## C.    James Evans Had Simultaneous Custody Of Both Q3 And Cody Crawford's DNA Sample.

This is another new fact that has emerged during the post-hearing effort to determine when,

by whom, and how many times Q3 was opened.  Mr. Crawford is still trying to figure out the

implication of this – but it seems irrefutable that the bottle cap and Mr. Crawford's known DNA

Page 16 DEFENDANT'S AMENDED SUPPLEMENTAL MEMORANDUM REGARDING
SUPPRESSION OF DNA EVIDENCE

sample were handled by the same person at the same time, and that this person was not a trained DNA scientist and the handling did not occur in the confines of a DNA lab.

One of the complaints made by Mr. Crawford at the hearing was that Q3 sat in the office of James Evans for a period of almost nine months, from February 23, 2011 to November 4, 2011. (Def. Exh. K at 3; Tr. at 120, 124).   The criticism is that the evidence was not in a secure evidence locker or storage facility, and there was no record of how many times it was handled during that time, or by who, or under what conditions it was kept. (Tr. 123-124).

Mr. Crawford now realizes that, at the same time Mr. Evans had Q3 checked out to him, Mr. Evans also had laboratory exhibit K5 checked out to him.  K5 was Cody Crawford's known DNA sample, consisting of swabbing taken from his mouth pursuant to a search warrant and submitted to the FBI laboratory.

That the bottle cap and Mr. Crawford's known DNA swab were kept in the same insecure and undocumented place at the same time is clear from the records. Defense Exhibit K shows that Mr. Evans received custody of Q3 on February 23, 2011, along with other items, and gave all those items to a person named Jeff A_____ on November 4, 2011.  (Def. Exh. K at 3).   The description of the items given by Evans to Jeff A___ is:

> Q1-20
> NEI
> nDNA 20

(Def. Exh. K at 3).  The description of items shipped by Jeff A___ to Oregon is:

> 2 boxes
> includes nDNA 20
> f/101207002\

Page 17 DEFENDANT'S AMENDED SUPPLEMENTAL MEMORANDUM REGARDING SUPPRESSION OF DNA EVIDENCE

(Def. Exh. K at 3). The "nDNA 20" on this list was Cody Crawford's known sample, K5. This is clear, not from Defense Exhibit K (another omission from the chain-of-custody logs) but from the chain-of-custody log for K5. That document is attached hereto as Defense Exhibit Z-1. That document shows that K5 was given to Evans on November 3, 2011 and was given by him to Jeff A____ on November 4, 2011 for shipment as part of "2 boxes." (Def. Exh. Z-1 at 2). Jeff A___ 's description of the shipment was that "nDNA 20 shipped w/101130010 shipment." The numerical cross-references work --- 101130010 was Q1-20, and 101207002 was K5. The packing slip for the shipment shows that the bottle cap and Cody Crawford's known DNA sample were in Evans' possession at the same time and were part of the same shipment back to Oregon. (Def. Exh. Z-1 at 3).

## II.   THE FBI LABORATORY'S PRACTICES WITH REGARD TO THE MAGLITE SUFFERED INCONSISTENCIES IN THE RECORDS, UNEXPLAINED CHANGES TO RECORDS, AND LACK OF AN IDENTIFIABLE AND RETRACEABLE COURSE OF HANDLING, SUCH AS TO RENDER THAT EVIDENCE INADMISSIBLE.

As with the bottle cap, earlier briefing described at length the failures in the FBI laboratory's handling and recordkeeping processes about the Maglite that render serious questions about whether the FBI employed reliable methodology in reaching its conclusion that Cody Crawford's DNA is present. (Def. Mot. at 14-16). As with the bottle cap, the evidentiary hearing showed even more failures by the FBI than had previously been realized, not fewer.

One of the major problems with the government's argument regarding the Maglite is that the government directly contradicts one of its main arguments regarding the bottle cap. This will be described below. There are three very serious flaws in the reliability of the methodology the FBI used for the Maglite.

Page 18 DEFENDANT'S AMENDED SUPPLEMENTAL MEMORANDUM REGARDING SUPPRESSION OF DNA EVIDENCE

**A.    The Government's Own Expert Explained That Laboratory Records Are Kept In Such A Way That accurate Contemporaneous Records Are Overwritten After The Fact And Replaced By Inaccurate Ones.**

The government's expert, Amber Carr, explained that one of the DNA testing records for the Maglite was inaccurate because the record had been overwritten later by a program that substituted inaccurate information for previously accurate information.   Skipping unnecessary complications, Mr. Carr explained this process with respect to these entries on this record:

| Specimen: Q12-1 | | | | |
|---|---|---|---|---|
| Cutting | Description | Describe By | Collect By | Collect On |
| **Q12-1a** | Textured areas of the handle and focusing area were swabbed using two swabs.  One swab was entirely cut for analysis.  Swab consumed. The other swab (Q12-1b) was retained in a coin envelope for possible future analysis. | jmj | lim | 12/27/2010 |
| Cutting | Description | Describe By | Collect By | Collect On |
| **Q12-1b** | Refer to collection notes on Q12-1a.  Swab was consumed for analysis. Applicator stick remains. | jmj | jmj | 1/7/2011 |

(Def. Exh. T-1; Tr. 81).  As Ms. Carr explained, the inaccuracy is with the "jmj" entry under "Describe By" on December 27, 2010.  She testified:

> The Description is accurate.  The Collect By is accurate. The Describe By, that is not accurate.  That is not the person who described that.  But it was overwritten by the system of when Q12-1b was created.  It then put that person's initials in that field.

(Tr. 81).  She had elsewhere explained:

> Because this was done on two different dates, our system, which is a trackable system, overwrites the original Description By with the second person who came in to create that Q12-1b.

(Tr. 75).  In other words, she asserts that the person who wrote the description on December 27 was not actually "jmj" but was actually "llm."  But when "jmj" did the second processing on January 7, 2011, the computer overwrote the previous "Describe By" entry for December 27, which would have been "llm," and replaced it with the inaccurate "jmj" entry.

Page 19 DEFENDANT'S AMENDED SUPPLEMENTAL MEMORANDUM REGARDING SUPPRESSION OF DNA EVIDENCE

It would ordinarily be a considerable revelation to learn that the FBI laboratory uses a process that writes over contemporaneous records and replaces them with inaccurate information. What makes it even more of a revelation here, however, is the fact that the FBI knows this is happening, sends a witness to a hearing to explain it, and tries to justify it as an acceptable practice. Mr. Crawford made the point in his Motion that the records of the FBI lab seem to show a swabbing was taken from the Maglite on January 7, 2011, at which time other records show that the Maglite had already been transferred away from the nDNA unit, making the taking of a swabbing on that date impossible. (Def, Mot. at 14-16). The government's response is to claim that the swabbing was actually taken on December 27, 2010 and simply not processed until January 7. The government's assertion of this is based on language in Defense Exhibit T-1, a document which the government's own expert says is unreliable because the system later overwrites contemporaneous information with incorrect information.

Ms. Arvizu was uncompromising in her criticism of the practice of re-writing a contemporaneous record:

> And it still is in direct conflict with the laboratory's procedure that was in effect at the time. And it's certainly incompatible with good recordkeeping practices as required by the international standard that serves as the basis for this laboratory's accreditation.

*  *  *

> …by her own testimony, the entries on these fields mean different things on different pages and do not in fact reflect reality. Just because it says that somebody did something doesn't mean they actually did it, which, from an auditor's perspective, renders these results unreliable for purposes of reconstructing the testimony in this case.

Page 20 DEFENDANT'S AMENDED SUPPLEMENTAL MEMORANDUM REGARDING SUPPRESSION OF DNA EVIDENCE

(Tr. 104). Ms. Arvizu also pointed out that Jade Eberts, the laboratory supervisor, initialed the form as approving it even though it contained inaccuracies.  (Tr. 104).

**B.    In Explaining The Processing Of The Maglite, The Government Takes A Position About Its Recordkeeping Practices That Is Directly Contradictory To The Government's Position With Regard To The Bottle Cap.**

In explaining the mistake in the record just noted – the entry of "jmj" in the "Describe By" column of the processing record - Ms. Carr explains that the person who actually described the events on December 27 was actually "lim," identified as Liliana Moreno.  This is Ms. Carr's explanation for how she knows that Liliana Moreno did the describing on that day and not "jmj:"

> Q:    Where is there a record or document in the paper trail of this item that actually says that the record is inaccurate as to who described an event?
>
> A:    The documentation is actually who has chain of custody of that item of evidence.  So if you refer to the chain of custody and specifically also the sample Processing Record, those two records show the individual with llm was the only person in possession of the item on that date.

(Tr. 76). The chain of custody record indeed shows that the item was checked out to Lilana Moreno on December 27, 2010 and that she checked it back on that date:



Page 21 DEFENDANT'S AMENDED SUPPLEMENTAL MEMORANDUM REGARDING SUPPRESSION OF DNA EVIDENCE

| Q12-1b (SWABBING) | _Signature_ | _Signature_ | 12/27/10 | ☐ To Extraction<br>☐ To Quantification<br>☐ To Amplification<br>☑ To CAG |
| Q12-1A9, Q9-1A9, Q9-2A9, Q9-3A9,<br>K5-1A9, K5-1A9, K9-2A9, K9-3A9 | _Signature_ | EVIDENCE STORAGE<br>_Signature_ | 12/27/10 | ☐ To Extraction<br>☐ To Quantification<br>☐ To Amplification<br>☐ To CAG |

(Gov. Exh. 11 at 4; Def. Exh S-1 at 1). Thus, says the government, proof that Ms. Moreno wrote the description on December 27 comes from the fact that she was the only person who had custody of the item on that date other than CAG, which was the storage unit. (Tr. 79).

This is directly contradictory to the position taken by the government with respect to the chain of custody logs for the bottle cap. Recall that on October 17, 2011, Supervisory Special Agent W. Mark Whitworth inspected and opened Exhibit Q3 and made a note about the presence of a bottle cap. (Def. Exh. L at 3; see above at 10). However, the evidence item was not logged out to Mr. Whitworth on October 17, 2011; indeed, it was never logged out to him. Between February 23, 2011 and November 4, 2011, the item was logged out to James J. Evans. (Def. Exh.K at 3). After Mr. Crawford's Motion complained of Whitworth's examination as an "unlogged inspection," Whitworth's affidavit asserted that there was nothing wrong with this and it was all according to "protocol." (Def. Mot. at 11; Gov. Exh. 10 at 2).

So, according to the government, chain of custody logs are proof as to who "described" the Maglite on December 27 because that person's name appeared on the chain of custody log, making her the only person who could have done it. But the same chain of custody logs are not proof of who "examined" the bottle cap on October 17 because such unlogged examinations are part of "protocol." In point of fact, in both instances the FBI laboratory failed to follow unambiguous, reconstructable procedures of documenting the handling of evidence items in its custody.

Page 22 DEFENDANT'S AMENDED SUPPLEMENTAL MEMORANDUM REGARDING SUPPRESSION OF DNA EVIDENCE

C.    **The FBI Laboratory Also Used Inconsistent Practices So That The Same Terms Were Given Different Interpretations By Different Recordkeepers. Making It Impossible To Know Exactly What Was Done On What Date.**

This was well addressed at the hearing, and Mr. Crawford anticipates that the government may present some additional assertions about it.  In short, during its DNA extraction and analysis processes, different technicians applied the term "Collect On" to mean different things, so that it was not possible to say with certainty that certain procedures were reliably followed.  Tr 100-103.

Mr. Crawford made a lengthy presentation at the hearing regarding the recordkeeping practices and course of handling with regard to the DNA samples, reagent blanks, and other materials.  There were numerous instances when dates were changed in handling logs, when the identity of items being handled was changed, and when other changes were made to logs which appear backdated and when the basis for the changes was not stated.  (Tr. 111-115).  Because Mr. Crawford, after discussions with counsel, anticipates that the government may request to be able to present additional assertions, Mr. Crawford reserves further comment except to point out the numerous discrepancies noted by Ms. Arvizu in her testimony.

III.    **BREAKS IN THE CHAIN OF CUSTODY AND IRREGULARITIES IN THE HANDLING OF THE EVIDENCE ITEMS RENDERS THEM INADMISSIBLE UNDER BOTH DAUBERT AND RULES 901 AND 403.**

Mr. Crawford's earlier briefing discussed the legal authorities at great length.  (Def. Mot. at 19-34; Def. Reply at 5-11). The purpose of this present brief is not to rehash those arguments that have been extensively made, but rather to point out that evidence adduced since those briefs were written, both during and since the evidentiary hearing, shows the government's proffered evidence to be even less reliable, and less admissible, than Mr. Crawford had previously argued.

Page 23 DEFENDANT'S AMENDED SUPPLEMENTAL MEMORANDUM REGARDING SUPPRESSION OF DNA EVIDENCE

This the 19th day of March, 2015

_/s/ Bryan E. Lessley_____
Bryan E. Lessley
**Attorney for Defendant**

Page 24 DEFENDANT'S AMENDED SUPPLEMENTAL MEMORANDUM REGARDING SUPPRESSION OF DNA EVIDENCE