UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No. 6:11-cr-60097-AA |
| Plaintiff, | OPINION AND ORDER |
| v. | |
| CODY CRAWFORD, | |
| Defendant. | |

AIKEN, Chief Judge:

Defendant is charged with damaging religious property in violation of 18 U.S.C. § 247(c) and using fire to commit a felony in violation of 18 U.S.C. § 844(h)(1). The charges arise from an arson committed on November 28, 2010 at the Salman Alfarisi Islamic Center, a mosque located in Corvallis, Oregon. Defendant moves to suppress the results of DNA testing conducted on two objects: a soda bottle cap and a flashlight. Defendant argues that the DNA testing methodology was unreliable and that

1  -    OPINION AND ORDER

the government cannot establish that the DNA samples were taken from items found at the arson scene.

On January 6, 2015, the court heard oral argument and testimony from several witnesses and the parties subsequently submitted supplemental briefing. Defendant's motion is granted with respect to the bottle cap and denied with respect to the flashlight.

## I. BACKGROUND

During the early morning hours of November 28, 2010, a member of the Corvallis Police Department noticed smoke and flames emitting from the mosque. The Corvallis Fire Department responded and an investigation revealed that the fire was intentionally set. According to the government, the arson occurred shortly after reports of a potential bombing at the Portland Christmas Tree-Lighting Ceremony.

The fire was contained to the office area of the mosque. Gasoline had been poured along the sill of a broken window and on the carpet near the window. Outside, Corvallis Police Sergeant Jef Van Arsdall discovered a two-liter soda bottle about four to five feet from the broken window. The top of the bottle was melted, as if exposed to heat, and it contained a liquid that smelled like gasoline. Sgt. Van Arsdall also discovered a blue Mag-Lite flashlight lying in the walkway leading to the entrance of the mosque. Gov't Ex. 1 at 1, 3.

Sgt. Van Arsdall reported that he also observed a brick and "a white bottle cap just to the south of the brick" near the broken window. Gov't Ex. 1 at 1, 3. Sgt. Van Arsdall reported that he collected the "observed evidence" and "placed each piece of evidence into its own bag." Gov't Ex. 1 at 3. However, no police report or evidence log indicates that a bottle cap was collected, logged into evidence, or placed in an evidence bag. Sgt. Van Arsdall then gave the evidence items to Corvallis Police Officer Greg Blount to be catalogued as evidence. Ofc. Blount documented the evidence and listed 18 items, including the flashlight and the brick; however, the evidence list does not reference a bottle cap. Def. Ex. A at 4; Gov't Ex. 1 at 1-2.

Shortly thereafter, Corvallis Police Detective Tyson Poole transported the soda bottle to the police station "in an attempt to process and fingerprint it." Gov't Ex. 1 at 11; see also Def. Ex. A at 4. Det. Poole removed the label from the soda bottle and placed it in a new evidence envelope and labeled it JTP1. He also "placed the bag the bottle was originally placed in" into another evidence envelope and labeled it JTP2. Gov't Ex. 1 at 11. He then placed the soda bottle itself into a third evidence envelope and labeled it JTP3. Det. Poole photographed each of these items and described JTP2 as a "bag w/burned residue originally holding JTP3." Def. Exs. B, C. Det. Poole's report does not reference a bottle cap or reflect that he observed or

3  -    OPINION AND ORDER

photographed a bottle cap. Det. Poole sealed the evidence envelopes, and they were transported to the Portland FBI office and relabeled; according to the government, JTP2 was relabeled as 1B:3.

Meanwhile, law enforcement officers canvassed the neighborhood surrounding the mosque for witnesses. At 11:00 a.m., approximately seven hours after the fire, defendant was interviewed by FBI Special Agent Melanie Wissel and Corvallis Police Detective Bryan Rehnberg. Defendant stated that he had learned about the fire from news reports but denied knowing anything else about it. When SA Wissel asked if he had further information, defendant volunteered that his blue Mag-Lite flashlight had been stolen from his porch, and he expressed anger about the theft. At that point, it was not public knowledge that a similar flashlight had been found at the arson scene.

Detectives Rehnberg and Poole returned to defendant's home around 5:00 p.m. on November 28 and showed him a picture of the flashlight found at the mosque. Defendant admitted that it looked like his flashlight.

Two search warrants were obtained and executed at defendant's home during the early morning and evening hours of November 29. Law enforcement authorities seized cans of motor oil and a partially full gasoline can, along with batteries

4 -    OPINION AND ORDER

similar to those found in the flashlight and defendant's laptop computer. Numerous soda bottles were also found at defendant's home, though the government maintains that no soda bottle or bottle cap were seized from defendant's residence. The next day, officers returned with a third search warrant and obtained swabs of defendant's DNA.

On November 29, 2010, evidence from the arson scene was shipped to FBI laboratories in Quantico, Virginia. The envelope labeled JTP2/1B:3 was received by the Explosives Unit on November 30, 2010 and apparently entered into evidence as Exhibit Q3. Def. Ex. K at 1; Gov't Ex. 6. Q3 was transferred within the unit on December 7, 2010 and again on February 23, 2011. Def. Ex. K at 1, 3. At this point in the chronology of documents, no police report, evidence log, or chain-of-custody report references a bottle cap collected from the arson scene.

On January 5, 2011, Corvallis Police Officer Bretton Roach issued a report and discussed the absence of the bottle cap:

> In the course of this investigation, I learned that a bottle cap had been located at the scene. The bottle cap was located by Sgt. Van Arsdall during his initial response. It was located in conjunction with the two-liter bottle of Fanta and a brick. Sgt. Van Arsdall later indicated that he did seize all of those items as potential evidence. The items were initially placed in Sgt. Van Arsdall's vehicle. When Ofc. Blount arrived on scene, he was designated as the primary officer for the incident. Sgt. Van Arsdall gave the seized items to Ofc. Blount to be entered into Evidence.

5    -    OPINION AND ORDER

> In reviewing the list of seized property related to this case, I cannot find any documentation of the bottle cap being entered into the Corvallis PD Evidence. On 01-04-11, I confirmed with [Special Agent] Soule that the FBI was not in possession of the bottle cap.
>
> Based on the fact that the bottle cap is not in the Corvallis PD Evidence storage, and it is not stored by the FBI, it appears that the bottle cap was initially seized, but was never entered into Evidence. I am unable to account for the location of the bottle cap at this time. If the cap is located in the future, it would be unusable as an evidence item due to the lack of chain of custody.

Def. Ex. E.

Although not noted on custody logs, Q3 apparently was opened on April 8, 2011 and visually inspected on October 17, 2011. According to the visual examiner, Q3 contained "plastic melted pieces and a screw top plastic bottle top." Def. Ex. L at 3. The visual examiner also reported that, according to the DNA examiner, the bottle top "would not be a good DNA source." Id.; Def. Ex. J at 4. The visual examiner reported these findings to the Portland FBI office in a report dated October 18, 2011. Def. Ex. J.

On November 4, 2011, Q3 was boxed and returned to the FBI office in Oregon; it was received there on November 7, 2011. Def. Exs. H at 3, K at 3.

Sometime in January 2012, the FBI office discovered a bottle cap in Q3. Shortly thereafter, Det. Poole prepared a supplemental report and indicated that the bottle cap found in

6    -    OPINION AND ORDER

Q3 was consistent with the appearance of the bottle cap located by Sgt. Van Arsdall on the night of the arson. Gov't Ex. 1 at 12. Det. Poole also stated that he "inadvertently" left the bottle cap in the bag labeled JTP2/1B:3, though his inadvertence was "unknown" to him. Id.

On February 8, 2012, JTP2/1B:3/Q3 was sent back to the FBI lab in Quantico and submitted to the DNA Unit for testing.

On April 2, 2012, a report was issued stating that a single source of DNA was found on the bottle cap, with odds of the DNA being attributed to someone other than defendant as one in 3.5 million in the Caucasian population. Gov't Ex. 8.

With respect to the flashlight, police reports indicate that it was seized from the scene of the arson and entered into evidence as GLB1. Def. Ex. A at 1. On November 28, 2010 the flashlight was transferred to FBI custody and relabeled as 1B:15. Def. Ex. G at 2. The flashlight was then transported to the FBI Explosives Unit at Quantico and entered into evidence as Q12. Def. Exs. J at 1, K at 1.

The flashlight was transported to the DNA Unit on December 14, 2010, and swabbed for DNA samples on December 27, 2010. Def. Exs. K at 2, S. The two swabs were labeled Q12-1a and Q12-1b. The first swab, Q12-1a, was processed on December 27 to remove DNA from any cells present on the swab. Def. Ex. T at 1. The second swab, Q12-1b, was placed in an envelope and transferred

7    -    OPINION AND ORDER

to the DNA Unit evidence storage. Id. On January 3, 2011, the flashlight was returned to the Explosives Unit. Def. Ex. K at 2. On January 7, 2011, the second swab, Q12-1b, was processed to remove the DNA from cells present on the swab. Def. Ex. T at 1.

A DNA mixture was present on the flashlight swabs; it was determined that defendant was a major contributor to the mixture, with the odds of someone else being a major contributor as one in 3.7 million in the Caucasian population. Gov't Ex. 9.

On August 24, 2011, a federal grand jury issued a two-count indictment charging defendant with the current offenses.

## II. DISCUSSION

Defendant argues that the chain of custody for the bottle cap is "irretrievably broken" and warrants suppression of the DNA testing. Def. Am. Suppl. Mem. 1. Defendant also contends that the testimony presented at the hearing revealed additional chain-of-custody questions and inconsistent laboratory documentation that warrants suppression of the flashlight DNA testing as well. The government maintains that defendant's expert witness challenged the FBI's testing methodology beyond the issues raised in defendant's initial briefing, and the government requests a second evidentiary hearing to further develop the record. For the reasons discussed below, I agree that the DNA testing of the bottle cap must be suppressed. However, I find that issues relating to the flashlight are

8   -   OPINION AND ORDER

better presented to the jury and do not require a second evidentiary hearing.

A. Soda Bottle Cap

Defendant argues that DNA evidence from the bottle cap must be suppressed, because no report documents either the collection of a bottle cap or the chain of custody for the bottle cap submitted for testing. Defendant notes that other soda bottles with similar white caps were found at his residence, and that the tested bottle cap could have been found at his residence. Defendant further argues that the flawed laboratory procedures employed by the FBI render it impossible to determine when and by whom Q3 was opened and/or examined, further undermining the reliability of the DNA testing. The government contends that defendant's arguments go to the weight rather than admissibility of the DNA evidence and should be considered by the jury.

At the conclusion of the evidentiary hearing, I indicated interest in two issues: 1) who collected a bottle cap from the arson scene and placed it into an evidence bag, and when; and 2) when, where and how many times JTP2/1B:3/Q3 was unsealed and/or examined, and by whom. Ultimately, neither the hearing testimony nor the supplemental briefs resolve these issues to the court's satisfaction. Regardless, I agree with defendant that the failure to log, inspect, inventory, and maintain a chain of custody for the bottle cap renders the DNA testing of it

9   -   OPINION AND ORDER

inadmissible. As a result, I need not address defendant's arguments regarding the FBI's laboratory procedures with respect to the bottle cap.[1]

"To satisfy the requirement of authenticating or identifying an item of evidence, the proponent must produce evidence sufficient to support a finding that the item is what the proponent claims it is." Fed. R. Evid. 901(a); see also United States v. Solorio, 669 F.3d 943, 954, n.13 (9th Cir. 2012); United States v. Harrington, 923 F.2d 1371, 1374 (9th Cir. 1991). Pursuant to this requirement, "[t]he district court may admit the evidence if there is a 'reasonable probability the article has not been changed in important respects.'" Harrington, 923 F.2d at 1374 (quoting Gallego v. United States, 276 F.2d 914, 917 (9th Cir. 1960)). "The government need only make a prima facie showing of authenticity, as '[t]he rule requires only that the court admit evidence if sufficient proof has been introduced so that a reasonable juror could find in favor of authenticity or identification.'" United States v. Black, 767 F.2d 1334, 1342 (9th Cir. 1985) (citation omitted). I find that the government fails to submit sufficient evidence for

---

[1] Specifically, defendant argues that: 1) it is unclear who relabeled 1B:3 as Q3; 2) the numerous markings and initials on Q3 do not all correspond with evidence log initials and dates; 3) the evidence logs and other documents reflect gaps in the chain of custody for Q3; and 4) evidence logs contain inconsistent descriptions of the contents of Q3. Def. Am. Suppl. Mem. 6-14.

10 -     OPINION AND ORDER

a reasonable jury to find that the bottle cap submitted for DNA testing is the same bottle cap observed at the scene of the arson.

It is undisputed that no police report or contemporaneous document reflects the collection of a bottle cap from the arson scene. While Sgt. Van Arsdall reported that he observed a bottle cap and placed each piece of collected evidence in its own bag, no police report reflects that a bottle cap was collected or placed in a separate evidence bag or in the same evidence bag as the soda bottle. E.g., Def. Ex. A; Gov't Ex. 1. Further, Sgt. Van Arsdall reportedly gave the collected evidence to Ofc. Blount, who created an evidence log of eighteen items; the evidence log does not include a soda bottle cap. Def. Ex. A; Gov't Ex. 1 at 1-2. Finally, while Det. Poole transported the original evidence bag with the soda bottle to the police station for processing, his initial report does not reference a bottle cap in any way. Gov't Ex. 1 at 11.

Moreover, the record does not include a close-up picture of the bottle cap observed at the scene of the arson, and no reliable evidence documents its condition at the time. The only photograph of the bottle cap is a picture focused on the brick found outside the mosque; in the lower right corner is what appears to be the leg of a barbeque, with a white bottle cap

11 -     OPINION AND ORDER

under the barbeque. Def. Ex. D. The bottle cap is not emphasized and its condition is not clearly discernable.

The failure to document evidence of a bottle cap is reflected in Ofc. Roach's report dated January 5, 2011. He concedes that chain-of-custody questions and the inability to locate the bottle cap would preclude it from being admitted as evidence, should it ever be discovered. Def. Ex. E. The government nonetheless contends that Ofc. Roach's conclusion was based on his erroneous assumption that the FBI did not possess the bottle cap at that time, when, in fact, it did. Gov't Suppl. Response 12. However Ofc. Roach did not "assume" that the FBI did not possess the bottle cap; on January 4, 2011, he was told that the FBI did not possess the bottle cap. Def. Ex. E ("On 01-04-11, I confirmed with SA Soule that the FBI was not in possession of the bottle cap.").

In fact, the first mention of a bottle cap in the chronology of records is a report dated October 18, 2011, indicating that the contents of Q3 were visually inspected and included a bottle cap. Def. Exs. J at 4, L at 3. This inspection occurred more than ten months after the arson and collection of evidence at the scene, and it should be noted that a DNA examiner found the bottle cap unsuitable for testing. Id. In other words, no record of a bottle cap exists until almost a

year after the arson was committed, and that bottle cap was deemed an unsuitable DNA source.

Despite the lack of evidence establishing the identity or authenticity of the bottle cap submitted for DNA testing, the government contends that Det. Poole's 2012 supplemental report, along with the ultimate discovery of a bottle cap in Q3, establishes that the bottle cap observed at the arson scene is the same bottle cap tested for DNA. The government maintains that evidence from defendant's residence was not collected until the following day and was shipped separately to the FBI lab in Quantico and could not have been co-mingled with evidence from the arson scene. Accordingly, the government argues that any mistake in the chain of custody goes to the weight rather than the admissibility of the DNA evidence. See Harrington, 923 F.2d at 1374 ("The possibility of a break in the chain of custody goes only to the weight of the evidence."); United States v. Chischilly, 30 F.3d 1144, 1154 (9th Cir. 1994) (reasoning that "[t]he impact of imperfectly conducted laboratory procedures might therefore be approached more properly as an issue going not to the admissibility, but to the weight of the" evidence), overruled on other grounds by United States v. Preston, 751 F.3d 1008 (9th Cir. 2014).

Granted, Det. Poole's supplemental report – prepared long after the arson – states that he "inadvertently left the bottle

13 -    OPINION AND ORDER

cap" in the original evidence bag that became JTP2/1B:3/Q3. Gov't Ex. 1 at 12. However, Poole also states that his inadvertence was "unknown" to him; he does not report that he observed a bottle cap in the evidence bag and neglected to remove it. Id. Given that the evidence had been collected when he arrived on the scene, along with the fact that his initial report does not mention a bottle cap, it is unclear when Det. Poole would have observed it. Gov't Ex. 1 at 11. Regardless, Det. Poole's supplemental report does not clarify who collected a bottle cap at the mosque or why the bottle cap was not logged into evidence or placed in a separate evidence bag. Therefore, I do not find that Det. Poole's supplemental report suffices to establish authenticity of the bottle cap.

Likewise, the subsequent discovery of a bottle cap in an evidence bag does not establish its identity or authenticity. As emphasized by defendant, the bottle cap discovered in Q3 is gray and discolored, while the bottle cap photographed at the scene of the arson appears white. See Def. Exs. D, Q at 7, Q-1.[2] No

---

[2] The government maintains that testing for DNA and latent prints affected the color of the bottle cap. In its supplemental memorandum, the government asserts that "the bottle cap looked whiter when SA Soule took a picture of it in January 2012 before he sent it back to the lab for DNA testing. (Exhibit 17)." Gov't Suppl. Response at 10. However, when SA Soule testified about inspecting the bottle cap in January 2012, he made no mention of taking a photograph. Transcript of Proceedings (Tr.) 24-26, 29, 32-33 (Jan. 6, 2015). No declaration accompanies the photograph

14 -    OPINION AND ORDER

evidence establishes when the bottle cap was placed in Q3 or by whom; rather, the government asks this court to assume that the bottle cap was placed in JTP2/1B:3/Q3 at the arson scene and remained there until its eventual discovery. I decline to make this assumption when no chain-of-custody records support it, and the government admits that it cannot determine how many times Q3 was opened or examined or by whom. Gov't Suppl. Response at 7, 9; see also Tr. at 71-72 (unexplained gap in chain of custody for Q3 while at FBI). Moreover, neither the Corvallis Police Department nor the FBI could account for the bottle cap as of January 5, 2011.

For these reasons, I find the facts of this case distinguishable from those of United States v. Manning, 738 F.3d 937 (8th Cir. 2014), a case cited by the government. There, a Memorex disc containing child pornography was not logged as evidence after being seized from the defendant's residence, because it apparently was lodged behind another disc in a plastic case. Id. at 941. The plastic case with both discs was sealed in an evidence envelope at the time of the search and transported to a forensics lab; there, the envelope was unsealed and the Memorex disc was found in the plastic case behind the other disc. Id. The Eighth Circuit found that the defect in the

---

identified as Exhibit 17; therefore, it is unclear who took the photograph or when.

15 -    OPINION AND ORDER

chain of custody went to the weight of the evidence rather than its admissibility under the circumstances. Id. at 944.

Here, unlike the disc, the bottle cap was not discovered in a closed case or box taken from defendant's home; it was observed at the scene of a crime. Further, the bottle cap could not be accounted for shortly after the arson, and no record of a bottle cap existed until almost a year afterward. Finally, it is unknown how many times Q3 was opened or by whom, and defendant raises reasonable questions regarding changes in the bottle cap's appearance.

Importantly, the issue is not an "imperfectly conducted" DNA test, laboratory protocol, storage procedure, or even a minor break in the chain of custody. Chischilly, 30 F.3d at 1154. Rather, the issue is the identification and authenticity of the bottle cap; i.e., whether the bottle cap the government submitted for DNA testing is actually the bottle cap observed at the scene of the arson. Aside from after-the-fact explanations, no evidence establishes that the bottle cap in question was seized from the mosque or explains how a bottle cap ended up at the DNA Unit.

Thus, while some breaks in the chain of custody may be issues for the jury, the failure to document the collection and storage of the bottle cap observed at the arson scene raises insurmountable authentication and identification obstacles. See,

16 -    OPINION AND ORDER

e.g., United States v. Edwards, 235 F.3d 1173, 1178 (9th Cir. 2000) (finding that the failure "to conduct a thorough initial search" of a bag, the removal of the bag from evidence, and the "circumstances of the discovery of the bail receipt" inside the bag rendered the bail receipt "inherently unreliable" and inadmissible); see also United States v. Mejia, 597 F.3d 1329, 1336 (D.C. Cir. 2010) (serious breaks in the chain of custody of an item can result in its inadmissibility).

Accordingly, I find that the government fails to present sufficient evidence for a reasonable jury to find that the bottle cap tested for DNA was the same bottle cap observed at the scene of the arson. As a result, the bottle cap and DNA testing of it will be suppressed at trial.

B. Flashlight

Defendant does not contest the collection or documentation of the flashlight. See Def. Exs. A at 1, G at 2. Defendant nonetheless argues that DNA evidence from the flashlight must be suppressed, because the DNA testing reports are unreliable. Specifically, defendant contends that the reports indicate that the flashlight was tested for DNA evidence on January 7, 2011, after it was returned to the Explosives Unit on January 3. Thus, defendant argues that the DNA sample tested on January 7 could not have originated from the flashlight.

17 -    OPINION AND ORDER

As explained by the government, lab documentation indicates that the flashlight was swabbed with two swabs on December 27, 2010. One swab was processed that day; the second swab was retained by the DNA Unit and processed on January 7, 2011. See Def. Ex. T at 1. Although the flashlight was returned to Explosives Unit on January 3, the second swab, not the flashlight, was the evidence tested on January 7. Id.

Defendant nonetheless argues that the DNA Unit's record-keeping practices cast doubt on the accuracy of the DNA testing records identified as Exhibit T. Defendant relies on the testimony of government expert Amber Carr, who explained the "Describe By" and "Collect By" notations on Exhibit T.

Exhibit T includes the following entry for December 27, 2010, under the "Description" heading: "Textured areas of the [flashlight] handle and focusing area were swabbed using two swabs. One swab was entirely cut for analysis. Swab consumed. The other swab (Q12-1b) was retained in a coin envelope for possible future analysis." Def. Ex. T at 1. Next to "Description" are the headings "Describe By" and Collect By." Under the "Describe By" heading for December 27 are the initials "jmj," indicating that the DNA testing process was described by jmj. Id. Under the "Collect By" heading for December 27 are the initials "llm," indicating that llm collected the sample. An entry for January 7, 2011 states under "Description" that the

18 -    OPINION AND ORDER

second swab "was consumed for analysis" on that day. Id. The initials "jmj" are under both the "Describe By" and "Collect By" headings for January 7, indicating that jmj completed both tasks. Id.

According to Ms. Carr's testimony, however, the person who actually wrote the description for the December 27 entry was "llm," even though the initials "jmj" appear under the "Describe By" heading. Tr. at 75, 81-82. Ms. Carr explained that the computer software program overwrote the December 27 "Describe By" entry for "llm" when "jmj" processed the second swab on January 7. Id. Defendant argues that this overwrite renders the DNA testing records unreliable and the DNA evidence inadmissible.

However, I find that defendant's argument challenges the procedures and protocol employed by the FBI and goes to the weight rather than the admissibility of the evidence. See Chischilly, 30 F.3d at 1154. I note that the chain-of-custody records reflect that the person identified as "llm" took custody of the flashlight on December 27, 2010 and returned it that day. See Gov't Ex. 11 at 4-5. Although defendant argues that the government's reliance on the custody records for the flashlight contradicts its position with respect to the bottle cap, Def. Am. Suppl. Mem. 21-22, the fact remains that the custody records support the government's position and Ms. Carr's testimony.

19 -     OPINION AND ORDER

Further, the government submits an expert declaration that clarifies FBI laboratory procedures in response to defendant's contentions. See Gov't Ex. 14. Most importantly, defendant does not question the identification of the flashlight or the fact that it was tested. Therefore, this issue is more akin to imperfect laboratory or record-keeping procedures and goes to weight rather than admissibility

In sum, unlike the bottle cap DNA testing, I find that the reliability of the flashlight DNA testing is more appropriately resolved by the jury.

### III. CONCLUSION

Defendant's Motion to Suppress the Results of DNA Testing (doc. 84) is GRANTED with respect to the soda bottle cap and DENIED with respect to the flashlight.

IT IS SO ORDERED.

Dated this 18 of June, 2015.

_____
Ann Aiken
United States District Judge

20 -    OPINION AND ORDER