1      UNITED STATES DISTRICT COURT

2           DISTRICT OF OREGON

3      THE HON. ANN AIKEN, JUDGE PRESIDING

4

5

6   UNITED STATES OF AMERICA,        )
                                     )
7                   Government,      )
                                     )
8           v.                       ) No. 6:11-cr-60097-AA-1
                                     )
9   CODY SETH CRAWFORD,              )
                                     )
10                  Defendant.       )
   _____)

11

12

13      REPORTER'S TRANSCRIPT OF PROCEEDINGS

14              EUGENE, OREGON

15         WEDNESDAY, APRIL 11, 2018

16             PAGES 1 - 34

17

18

19

20

21              Kristi L. Anderson
                Official Federal Reporter
22              United States Courthouse
                405 East Eighth Avenue
23              Eugene, Oregon 97401
                (541) 431-4112
24              Kristi_Anderson@ord.uscourts.gov

25

1    APPEARANCES OF COUNSEL:

2

3    FOR THE GOVERNMENT:

4    Gavin W. Bruce
     U.S. Attorney's Office
5    405 E. 8th Avenue
     #2400
6    Eugene, OR 97401
     541-465-6771
7    Fax: 541-465-6917
     Email: Gavin.Bruce@usdoj.gov

8

9    FOR THE DEFENDANT:

10   Bryan E. Lessley
     Office of the Federal Public Defender
11   859 Willamette Street
     Suite 200
12   Eugene, OR 97401
     541-465-6937
13   Fax: 541-465-6975
     Email: bryan_lessley@fd.org

14

15

16

17

18

19

20

21

22

23

24

25

1          PROCEEDINGS

2        WEDNESDAY, APRIL 11, 2018

3          THE CLERK:  Now is the time set for Criminal Case

4    No. 11-60097, the United States of America versus Cody Seth

5    Crawford for revocation hearing.

6          THE COURT:  Mr. Lessley.

7          MR. LESSLEY:  Good morning, Your Honor.

8          There are two petitions, one of them dated

9    September the 26th of 2017, alleging that Mr. Crawford

10   failed to complete and participate in the program of an RRC

11   and then the second petition dated October the 10th of 2017,

12   alleging a new law violation, essentially spitting at a

13   member of the sheriff's office at the jail.

14          Mr. Crawford is prepared to admit both violations.

15          With respect to the first violation; that is, the

16   termination from the RRC, there's a lot in the narrative

17   that he either doesn't remember or just doesn't agree with,

18   and so I don't want to be in a position of nitpicking the

19   narrative.

20          He does admit that he, through his own conduct,

21   caused himself to be discharged from the RRC.

22          THE COURT:  Mr. Crawford, you heard what

23   Mr. Lessley has told me about your desire to go forward

24   today and admit the allegations in both petitions, correct?

25          THE DEFENDANT:  Yes, Your Honor.

09:18:23

1    THE COURT:  And he has been your lawyer for some
2  time?
3    THE DEFENDANT:  Yes.
4    THE COURT:  And you understand you have a right to
5  challenge these allegations, put on witnesses, testify, and
6  require the government to prove these are true?
7    THE DEFENDANT:  Yes, I do.
8    THE COURT:  And you wish to waive those rights and
9  simply admit that these are in fact true?
10    THE DEFENDANT:  Yes, Your Honor.
11    THE COURT:  And you understand you could be
12  resentenced up to -- between three to nine months but
13  potentially up to two years?
14    THE DEFENDANT:  Yes, Your Honor.
15    THE COURT:  So you wish to waive your rights and
16  simply tell me that these are true, correct?
17    THE DEFENDANT:  Yes.
18    THE COURT:  So in the October 10th, 2017, petition
19  for the show cause order, is it true that you violated
20  Standard Condition No. 2, you shall not commit another
21  federal, state, or local crime and shall not illegally
22  possess a controlled substance and that you were arrested
23  for two counts of aggravated harassment while in the Lane
24  County Jail, you were arraigned on aggravated harassment,
25  and the court trial date was set November 8th, 2017, in the

09:19:32   1    Lane County Circuit Court case.  That was the case, and I

2    presume that's been resolved.

3              MR. LESSLEY:  Your Honor, it's actually scheduled

4    to be resolved tomorrow.

5              THE COURT:  All right.

6              MR. LESSLEY:  Although there's an issue that Lane

7    County hasn't writed him yet.  But he has a currently

8    scheduled court date for tomorrow.  This is a joint

9    resolution.  The state knows --

10             THE COURT:  All right.  Excellent.  So that's part

11   of this -- so you acknowledge that -- tomorrow you are going

12   to apparently acknowledge that that did in fact happen?

13             THE DEFENDANT:  Yes, Your Honor.

14             THE COURT:  With regard to the earlier allegation,

15   violation of Special Condition No. 3, you must reside and

16   participate in the program at the residential reentry center

17   for not more than 180 days and follow all the rules and

18   regulations, a number of your acts and behaviors caused you

19   to be kicked out of the RRC and a verbal warrant issued by

20   the court on September 25th, 2017; is that right?

21             THE DEFENDANT:  Yes, Your Honor.

22             THE COURT:  Are you satisfied, counsel?

23             MR. BRUCE:  Yes, Your Honor.

24             THE COURT:  So you wish to admit both allegations,

25   correct?

09:20:34  1         THE DEFENDANT:  Yes.

2         THE COURT:  Admissions are noted.

3         Disposition.

4         MR. LESSLEY:  Your Honor, if I may --

5         Go ahead and sit down.

6         I know Mr. Crawford as well as I have ever known a

7   client, and Your Honor knows him quite well too.  And it's

8   an unfortunate part of his psychology that every few years

9   with a lot of irregularity he goes into these manic states.

10  He did so during -- a couple of times during the time that

11  his original case was pending.  It's also part of his

12  history.

13        There's very little doubt in my mind that he was

14  in one of those states last September.  The descriptions of

15  his behavior are very similar to the descriptions of his

16  past behavior.  He's had multiple hospitalizations in the

17  Oregon State Hospital.

18        When he was charged with the spitting incident in

19  Lane County and acquired a lawyer, I communicated with that

20  lawyer.  Her name is Allison Knight.  And I provided to

21  Ms. Knight the previous psychological diagnoses that had

22  been prepared during Mr. Crawford's original case, both done

23  by our side and also done by the Oregon State Hospital.

24        Ms. Knight has also had him undergo a

25  psychological evaluation in the last few months.  She has

09:21:58  1  not shared the results of that with me.  She hasn't shared

2  them with Mr. Crawford.  But my understanding is that the

3  results of that examination have led the district attorney's

4  office to agree to the disposition that's suggested here in

5  the probation office's recommendation.

6          The anticipation is that he will get a reimposed

7  term of federal supervision; that he will get an RRC

8  placement.  The recommendation is up to 120 days.

9          Our request and a very strong request is that that

10  be at the Northwest Regional Reentry Center.  I will talk

11  about that in a minute.

12          He also is going to undergo mental health

13  treatment.  Our request is that be at the Dual Diagnosis

14  Program at LifeWorks.

15          And I have shared those recommendations with the

16  Lane County attorney, and I understand they will be

17  incorporated into the terms of the Circuit Court judgment,

18  hopefully tomorrow, and so that he will plead guilty in

19  Circuit Court, he will receive this disposition, and will be

20  on probation in both courts.

21          The reason we want Portland is partly because of

22  the resource of LifeWorks; partly also because his mother is

23  still in a very bad state struggling with cancer.  She is at

24  OHSU.  She has been struggling with it for a long time, and

25  it seems like it's late stage at this point.  So we'd like

09:23:27  1  to be able to work through the reentry center there to be

2  able to have him visit.

3       Also, it's just closer to his home.  He grew up in

4  McMinnville, and he's just closer to that area.

5       So our request is that the court follow the

6  recommendations in the probation recommendation.  That's

7  just the background.

8       But there's very little doubt in my mind he was

9  going through yet another manic phase.  Sometimes they last

10  a long time; sometimes they don't.  He's not in it now, but

11  it's just an unfortunate part of his life.

12       MR. BRUCE:  Thank you, Your Honor.

13       Unlike Mr. Lessley, I am newer to this case.  Bud

14  Fitzgerald of our office prosecuted this case initially as

15  well as the supervised released issue up until his

16  retirement at the end of last year.

17       So I took it upon myself to kind of get an idea of

18  where we are at this point.  And these are some of the

19  things that I see, which is that he was -- Mr. Crawford was

20  released from the Oregon -- from OHP in October of 2016 and

21  one month later was arrested on a felony elude and a DUI.

22  He received a time served sentence for that in February of

23  2017 but then failed to attend drug and alcohol -- a drug

24  and alcohol assessment following that conviction.

25       In July of 2017, he was arrested on a probation

09:25:08

1 violation after testing positive for methamphetamine and

2 marijuana and spent -- and was given a 60-day sentence.

3 And then as -- in concert with the federal

4 probation office and the state, he was then released to the

5 RRC in September of 2017. Not more than two weeks after

6 arriving at the RRC, he started creating disturbances at the

7 RRC. Would fail to -- or refused to sign a mental health

8 assessment and, as alleged and admitted, was unwilling to

9 abide by the rules and regulations of the RRC as well as the

10 mental health treatment aspect of the center.

11 Looking at this pattern and the pattern of

12 Mr. Crawford's history, needless to say, the United States

13 is very concerned that when Mr. Crawford -- that

14 Mr. Crawford will remain a danger to society and to himself

15 if he does not follow through with appropriate mental health

16 treatment.

17 And the history of violence and dangerous

18 instability is evident in this record. It's not only in the

19 count of conviction here, it's a hate crime against the

20 Islamic Center in Corvallis, but as well as the conviction

21 that led him to the Oregon -- OHP in 2013. It's -- simply

22 put, when Mr. Crawford is unstable, the public is at risk.

23 So the original recommendation of probation, which

24 was a six-month sentence, it's clear that he's already spent

25 about that amount of time prior to this hearing as well as

09:27:10 1    on the state -- state crime issue.

2    And so therefore, we do -- we do agree with the

3    recommendation of probation for time served and a

4    reimposition of supervised release for the 36 months with

5    the mandatory mental health treatment.

6    I usually wouldn't speak at greater length when I

7    am simply agreeing with a recommendation, but I do think

8    it's -- it is worth noting what our concern is is that when

9    that treatment is not present in his life that it's

10    dangerous to society and it's dangerous to himself.

11    And so we would hope that whatever the resolution

12    here and whatever options he has available to him in

13    Portland, whether it's here or in Portland, that -- that we

14    are able to have a close eye on him because I am concerned

15    and the United States is concerned.

16    THE COURT:  I am appreciative of the United

17    States' concern, but the huge, glaring gap in what you just

18    said is this:

19    This is an article that came out June 14th, 2017.

20    Oregon ranks worst, W-O-R-S-T, in the United

21    States for mental health.  51st.  A new facility

22    opened in Portland to help people in crisis.

23    Oregon has the worst mental health rate in the

24    country, according to a recent study.  It's called

25    the Unity Center 24/7 mental health facility for

09:28:46  1    those in need of immediate help.  It's a

2    collaboration by OHSU, Legacy, Adventist and

3    Kaiser near the Moda Center in Northeast Portland.

4        Directors of the Unity Center say they have

5    been about a 95 -- it's been 95 percent full since

6    they opened in January.  It has inpatient rooms

7    where people can stay for several weeks, join

8    therapy groups, and receive medication.  They say

9    the problem is so bad, about 40 percent of the

10   people who arrive have to be committed to

11   long-term, involuntary facilities such as the

12   State Hospital in Salem.

13       The nonprofit Mental Health American --

14   Mental Health America recently ranked Oregon the

15   worst in the country for mental health rates and

16   little success to help for it.  The study says

17   that we have some of the worst rates for

18   homelessness, high school graduations, and child

19   abuse.  It all ranks and is all contributed to

20   mental health.

21       I think it's an epidemic as a nation, but I

22   don't think we do well taking care of people with

23   mental health illnesses, said a Portland

24   psychiatrist Mary Theodore.  She says part of the

25   problem is Oregon has so few psychiatrists,

09:29:48  1    partially because of low salaries, and, of the

2    psychiatrists who are in the state, most of them

3    are full and don't take new patients.

4        There's a certain percentage of people with

5    psychotic disorders who are paranoid and are not

6    being treated with medication and, in their

7    paranoid state, have a lot of suspicion about

8    going to see a doctor.

9        She believes Oregon also needs more master's

10   level social workers in our hospitals to spot

11   mental illness and to get people the kind help

12   they need, more day programs to get people therapy

13   so they don't reach the crisis point that would

14   admit them to facilities like Unity Center.

15       National statistics show about one in four

16   people has a mental health issue.  Dr. Theodore

17   believes it's even higher.  35 to 40 percent of

18   the people will see some kind of mental health

19   show up in their lifetime.

20       It may sound expensive, but in the end it's a

21   lot less expensive than having people in a

22   revolving door going in and out of emergency rooms

23   and using police officers to pick them up in the

24   streets.  I would also say parenthetically

25   correctional facilities.

The Unity Center's vice president, Mr. Ferentinos, says that they are seeing up to eight ambulances every day delivering people in an immediate mental health crisis.

They are in high distress. They are depressed, suicidal. We see individuals who are psychotic. They are out of control, presenting with paranoia or high on a drug like meth.

It's changing how police respond to calls for troubled persons in the street. Instead of dropping them off at a hospital where they would be admitted for one night, given a pill, and then sent back on the streets the next day, the Unity Center is helping to fight the root cause.

Instead of taking this person to jail because they are mentally in distress, they are actually bringing them here, which is a good thing.

Ferentinos says 77 percent of patients can be stabilized in the first 24 hours with medication and therapy and will be discharged with a plan and follow-up contacts. But she says homelessness and mental illness are intertwined.

I think individuals who are homeless and have mental illness most of time are having difficulty staying in stable housing because of their

1    behavior, and sometimes they are just a little

2    different or out of control.  The stress and

3    instability we are living in in Oregon and around

4    the country, it has definitely had a contribution

5    to what we are seeing in the mental health system.

6        Years ago there was a national movement to

7    close institutionalized mental health hospitals

8    because of harsh treatment and poor funding.

9    Hospitals in Portland and Eastern Oregon closed

10   down.  That left many of the patients homeless

11   because of inadequate follow-up care and housing.

12       An outpatient center to coordinate with Unity

13   is opening later this month by Adventist in

14   Northeast Portland.  Experts say we need even

15   more.

16       I say that because you didn't even mention mental

17   health evaluations.

18       This gentleman is one of the cases that requires

19   the system to have, frankly, better mental health services

20   because he is going to have episodic difficulties.  That's

21   just the nature of his disease.

22       Just like if you read the paper today, Mariah

23   Carey, your well known singer with a lot of money, she has

24   been able to hire and get the help she needs when she goes

25   into her episodic, classic crash and burns.

09:32:51

1          This gentleman goes out into the community, but we

2     have inadequate services.  I am concerned, and I am going to

3     put him up in the Northwest Regional Reentry Center, and I

4     am going to ask that Matt Preuitt take this case over.

5          But Matt Preuitt can't take every single mental

6     health case in this state.  And he's the probation officer

7     that has the best relationships with all the bare minimum of

8     services that are offered in Portland.

9          So the government can be upset and want to do

10    something, but I am going to tell you, Patty Perlow, the DA

11    over there, and I talk about this mental health crisis every

12    single time we are together.  This community doesn't have

13    remotely what it needs to help the mental health community

14    and the individuals like this, and they are going to fail

15    and they are going to commit crimes.

16         There by the grace of God could any member in your

17    family end up in this situation, and we need to do better.

18         So I call on the United States government to

19    actually recognize that we don't have the services, we don't

20    have the resources, we don't have the housing, we don't have

21    the institutional places to deal with the way in which we

22    need to humanely take care of people who have mental health

23    issues.

24         Now, Mr. Crawford has -- when he is medicated, not

25    in one of his cycles, he does pretty darn well.  And then he

09:34:09   1   gets -- either because the brain chemistry is so fragile it

2   tips or his medications aren't right or lots of times people

3   go into that manic phase and they think they are capable of

4   all sorts of things, and they go off their medications.

5        That's -- that's a systems issue we have to deal

6   with, and one at a time my goal is to get people to start

7   recognizing that so many people that we are sentencing have

8   those incredible, very complex, difficult bases of their

9   criminal justice activity and that we don't do anybody any

10  good just moving him in and out of a bed for a short period

11  of time without something with more stability.

12       I know the -- I know in -- I have every bit of

13  confidence that though they haven't shared, which I also

14  find amusing that we don't share the reports about the same

15  people we serve in the state and federal system, that they

16  are going to, over at the circuit court, they are going to

17  be pretty darn happy that we'll take responsibility, which I

18  have told Ms. Perlow we have more resources.  They are not

19  adequate at all, and they are not tempered with enough

20  mental health stuff, but they are better than what the state

21  has at the moment.

22       So I am going to follow the recommendation, but it

23  has everything to do with trying to get him in a place to

24  get stability and get him what he needs to find a long-term

25  plan.

09:35:33
1    But I would appreciate that maybe somebody would

2    in the -- talk about the bigger mental health issue in this

3    district and particularly in this Eugene area where we don't

4    have -- we barely have what's adequate, and Willamette

5    Family has now revamped their entire nonprofit to deal with

6    dual diagnosis clients down here, which they are being

7    overrun with.

8    And then, of course, we don't have anything,

9    really, down in Southern Oregon.

10    So this is a systems issue.

11    And Mr. Crawford, you are going to be in a

12    different spot up in Portland and a different situation.

13    And it's going to matter to you that you find one or more

14    resources up there, including Mr. Preuitt, who you can

15    communicate with to move you through your supervision period

16    successfully because you will end up in prison if you don't.

17    I say all this because I -- people come in here

18    and just neglect talking about the mental health side of

19    stuff.

20    And thank you, Mr. Lessley, for those.  I have

21    been with this case from the very beginning.  And, you know,

22    some cases are not just a quick fix.  So he's not a quick

23    fix.

24    MR. LESSLEY:  And, Your Honor, neither Mr. Morales

25    nor Mr. Bruce was with the case at the time, so I want to --

09:36:49  1          THE COURT:  That's right.

2          MR. LESSLEY:  I know Your Honor knows what I am

3   about to say, but I would like to provide this context too,

4   and it echoes what Your Honor read.

5          The original disposition of this case involved

6   a -- he had already been committed to the jurisdiction of

7   Oregon Health Authority through a Yamhill County case.  He

8   had about four years left -- it was a five-year commitment.

9   He had about four years -- Polk County.  I am sorry.  He had

10  about four years left of that commitment at the time Your

11  Honor sentenced him.  And the understanding at the time --

12  he was actually at the Oregon State Hospital at the time.

13         THE COURT:  Right.

14         MR. LESSLEY:  The understanding at the time was

15  that OHA, Oregon Health Authority jurisdiction, would, if it

16  were determined that he had -- was ready to leave the Oregon

17  State Hospital, that they would maintain jurisdiction,

18  provide housing, provide mental health treatment, and if it

19  was sensed that he was going manic again, they would have

20  the authority to adjust his placement.

21         Instead of that, seven months later, in October of

22  2014, they kicked him out of the Oregon Health Authority

23  entirely, and now he ended up on our lap without the

24  services that it was originally intended that they would

25  provide.

09:38:04  1        And that plan that we presented to Your Honor and

2    that Your Honor adopted was actually approved not just by

3    Your Honor, but there was an assistant attorney general

4    helping to prosecute the case, and that plan was approved at

5    some high level of the attorney general's office in

6    Washington.

7        And so we did really get kind of, and I use the --

8        THE COURT:  Drop-kicked.

9        MR. LESSLEY:  Drop-kicked by the Oregon Health

10   Authority that dropped what it said it would do, and now

11   this is landing in our lap because he should actually still

12   be under Oregon Health Authority jurisdiction through at

13   least some part of 2020, and he's not.

14       So that's just background for people who weren't

15   around at the time.

16       THE COURT:  And this is a complicated case.  But

17   there are no quick fixes on cases like this.

18       And, you know, until I leave the bench,

19   Mr. Crawford, and until you are off supervision, you are

20   stuck with me.

21       Not so stuck with Mr. Lessley.

22       THE DEFENDANT:  I know.  He's retiring.

23       THE COURT:  Yeah, I know.  There's a very strong

24   grapevine, even on walking paths.

25       So I will tell you that you are stuck with me,

09:39:12

 1  and, as you can see, your historical resource is going to be

 2  gone.

 3      And I will -- you know, but you have to go more

 4  than halfway with meeting the expectations of what this says

 5  because, frankly, when you go off your medication, you get

 6  cocky and do these crazy things that obviously have the U.S.

 7  Attorney's Office up in arms because they should be, but at

 8  the same time it doesn't do any good to just keep bringing

 9  you in and out of prison when they are not giving you

10  adequate medication or they are not giving you any

11  medication or they take you off medication.  We have to keep

12  you in a consistent process of being seen and being on the

13  right medications or it's just not productive.

14      MR. LESSLEY:  Your Honor, and this is going to

15  happen:  So he's going to presumably remain at Sheridan

16  until the bed becomes available.  Sheridan will let him

17  leave with a very small, few-day supply of whatever

18  medications they have him on.  He's not going to be able to

19  get on the Oregon Health Plan until he's out of custody.

20      So he's going to end up getting to the Northwest

21  Regional Reentry Center with a very small amount of

22  medication and no further care and no further prescription

23  provided for because he won't have a primary care physician

24  or prescribing physician until after he gets on Oregon

25  Health Plan and until after he can get an appointment, until

09:40:32  1    after he can get -- so there's going to be this delay.

2         So, once again, we are going to be in this

3    situation where his medications are going to be an issue at

4    the time he gets out.

5         And so -- and so, you know, one of the things that

6    we sometimes are able to do here is have someone kind of

7    anticipate and work with the Oregon Health Plan so that it

8    kicks in the day he's released rather than have him start

9    the application process then.

10        THE COURT:  Two things come to mind.

11        Number one, I'd ask you, Mr. Lessley, to have a

12   debriefing session with Matt Preuitt, and I will work my end

13   to see that this case gets assigned to him.  That's number

14   one.

15        And number two, there's rumors that your office,

16   short-timer that you are, has a social worker now hired.  I

17   have not met the social worker that's hired.  And other U.S.

18   Attorney's office have social workers on staff to make sure

19   that this happens from both ends.

20        But you at least have one up there, and I would

21   ask you to brief the social worker and have her stay in

22   contact with me so that we can make sure that he has the

23   medications he needs because, again, I am not sure how long

24   he will get to stay at the Northwest Regional Reentry Center

25   if he starts acting up.  They don't -- they are not -- their

09:41:50

1    tolerance level is such and their waiting list is such that

2    I am not sure if Mr. Cody starts to act up, he wouldn't be

3    just kicked out.

4         So that's a concern of mine and to get everything

5    set up in Portland.  I understand and you should be up there

6    if your mother's in the last stages of her illness.  You

7    need to be there, and I am going to make those

8    accommodations because, frankly, the best situation we have

9    for you right now is the Northwest Regional Reentry Center

10   because down here you have kind of burned some bridges and I

11   don't have anything in Southern Oregon.

12        And so I would like to hope that we can make this

13   work for you.

14        THE DEFENDANT:  I wouldn't want to start out in

15   Eugene again.

16        THE COURT:  Pardon?

17        THE DEFENDANT:  Eugene is overburdened.  That's

18   what I saw when I went to Willamette Family.

19        THE COURT:  Yes, Eugene is overburdened because we

20   are having to pick up the slack for Southern Oregon.  Yeah,

21   we are overburdened, and we are overburdened just with our

22   own demand here.  And we have no jail space.  We have no --

23   our resources are dwindling, and we are accepting, I guess,

24   the new normal, and I am not willing to accept the new

25   normal.

09:42:55   1          THE DEFENDANT:  My evaluator was falling asleep

2    during the evaluation with me at Willamette Family.  That's

3    why I thought they were overburdened.

4          THE COURT:  I don't really need to know the name

5    of the person, but maybe you could share that with

6    Mr. Lessley if you know the name of the person because I

7    will talk to Willamette Family.  That's unacceptable.  I

8    don't care to know who it is, but I think they need to know

9    that they have further staff for evaluations.  That's not

10   acceptable.

11         But that's -- and, again, when you talk about

12   Oregon being the worst when at least you have people who

13   care about that work, they are so strung out trying to do

14   this work.  We are asking too much of people making a modest

15   amount of money to hold a health care -- mental health care

16   system together with nothing.

17         So what -- you understand how significant this

18   period in your life has to be?

19         THE DEFENDANT:  I do.  I do understand.  And I

20   have also had a very difficult time finding a medication, a

21   medication that works for me that doesn't have such severe

22   side effects that it causes more issues for me than what

23   it's supposed to help.  It's a very fine line trying to find

24   stuff that's therapeutic versus detrimental.

25         For instance, when I was at the State Hospital,

09:44:17

 1   for the vast majority of the time I was there for three

 2   years, I was not on classic antipsychotics.  I was not on

 3   any medication for behavior.  I was on medication for a

 4   chronic pain condition that I have in my heel from when I

 5   shattered my heel when I was 18.

 6            And when I got out I couldn't find a doctor.  I

 7   didn't have OHP right away when I got out of the Oregon

 8   State Hospital, or maybe I did, but I just -- I had to jump

 9   into work all the time.  You know, I have had that job with

10   doing the Comcast contracting stuff, hard physical labor,

11   and I couldn't find a doctor that would refill the

12   prescription for the pain medicine I was on because of the

13   opioid epidemic because what I took was Tramadol and

14   Neurontin.

15            And the doctors, I figured they would just look at

16   me and say, oh, white male, opioid epidemic, he's burnt.

17   So --

18            THE COURT:  Well, what I hope is --

19            THE DEFENDANT:  Just didn't have the time to try

20   and find a doctor.

21            THE COURT:  -- when Mr. Lessley sits down and

22   talks to the probation officer and the social worker and the

23   social worker gets a chance to talk to you, I would strongly

24   suggest they go back and look at your files and the

25   recommendations and the medications you were on at the State

09:45:44    1    Hospital because that's three years the State of Oregon

            2    invested in getting you stable --

            3              THE DEFENDANT:  Yeah, I was stable.

            4              THE COURT:  -- and back ready to proceed in this

            5    litigation.  So somebody should take a look at what worked.

            6              THE DEFENDANT:  Thank you.  And in the meantime, I

            7    got myself put onto -- what is it called?  Tricyclic

            8    antidepressant.  It's an older one called Doxepin.  That's

            9    like two birds with one stone because it treats chronic

           10    pain, which ends up causing you depression when you have

           11    pain all the time, and it also treats panic disorders.  And

           12    I was treated fairly successfully with it.  I have been on

           13    it for three months at Sheridan under Dr. Cantu.

           14         But anticipating the problems with maintaining

           15    that medicine, transitioning into a group home environment,

           16    I started titrating off of that medicine because I figured

           17    it would be hard to get it, and I didn't want to just

           18    abruptly stop it like when I got to RCC in September,

           19    September 14th, I was taking trazodone nightly, like

           20    50 milligrams to help me sleep from Washington County Jail.

           21    And they didn't have any medicine for me the very day I got

           22    to the halfway house.  No trazodone.

           23         And I went in a complete manic phase.  And I tried

           24    really hard.  I tried.  I had no resources, no money, no

           25    nothing to be able -- they said, well, you can go buy

over-the-counter Benadryl.  I was like, well, I don't have

any money, but I did manage to get my flu vaccine, and I did

manage to get on nicotine lozenges because OHP covered that.

But I did the best I could.  I really did.  And I

know me being punished for mental health episodes by putting

me in jail where I catch new charges, that's terrible.  But

that's what we do in Oregon.

The cell block I am on in Springfield jail all

night long you had people banging on the walls and screaming

out because they were having hallucinations and stuff.

And this is -- I have seen this in every jail I

have been in in this country, and it's sad.  And I hope some

day maybe it can be a little bit different, but I know it

costs a lot of money, and I am going to do my part and I am

going to do the best that I can.

And thank you for the more than second chance

everybody.

THE COURT:  Well, you are getting sanctioned for

your behaviors, and we are trying to find the right

constellation of services that will sustain.  But --

THE DEFENDANT:  I did break the law, and I

understand that.

THE COURT:  People shouldn't have to break the law

to get services, purposefully or accidentally.

So I am going to follow the recommendation because

09:48:43  1  I want this case resolved by the state.  And I know
 2  Ms. Perlow has a commitment to try to do better work with
 3  mental health.  They have a mental health court, and she
 4  will tell you that it's a great concept, but they can't get
 5  people to come because they don't have housing.  They don't
 6  have enough stability to be able to come to a court
 7  appearance for a mental health court.  It's chaos.  So that
 8  court, their best efforts right now are struggling.

 9        I really believe a mental health reentry court, a
10  dual diagnosis reentry court -- I do it one at a time.  So I
11  will set up a status conference with you within two weeks of
12  your placement at the RRC to make sure everything is stable.

13        So I can't predict when that will be unless
14  Mr. Lessley knows what has been --

15        MR. LESSLEY:  We don't know a date yet.

16        PROBATION OFFICER MORALES:  Your Honor, I just
17  talked to my supervisor up in Portland, and he's saying it's
18  about seven to ten days is what they are looking at right
19  now as soon as the order is signed and we send the request
20  up to Seattle.

21        THE COURT:  So let's put -- why don't we put him
22  on my May -- when I am up in Portland in May.

23        THE CLERK:  Status conference is set for May 14th,
24  2018, at 2:30 p.m., in Portland.

25        THE DEFENDANT:  Oh, in Portland?

09:50:13  1           THE COURT:  I have -- I work out of Portland.

2           THE DEFENDANT:  Oh, okay.  Thank you.  I was

3       fearing the bus ride.

4           THE COURT:  No, no, no.  I will work -- I have a

5       Portland calendar.  That day -- I know that's a day I am up

6       there, but if I need to do something else.

7           So I am going to follow -- find that -- do the

8       formalities.  Based on the two violations, your term of

9       supervised released is revoked.

10          You are committed to the custody of the Bureau of

11      Prisons for time served considered served.

12          I believe that you are appropriate for continued

13      community supervision, but you need assistance with your

14      medication and mental health requirements.

15          So I am going to order that you reengage in all

16      the services that have been previously announced and then

17      the following additional conditions:

18          That you shall reside in a residential reentry

19      center for up to 180 days.

20          MR. LESSLEY:  Your Honor, the recommendation was

21      120.  I am not quibbling.  I am just saying --

22          THE COURT:  On mine it says 180.

23          Well, no.  I see what that -- it's a weird format.

24          So up to 120 days.  You were to be 180 days in the

25      previous order.

09:51:34　1　　　　120 days.

2　　　　You are to follow the regulations and the

3　obligations of the center.

4　　　　You are remanded to the custody of the marshals

5　and will remain in custody until your bed becomes available,

6　which I am grateful is seven to ten days.

7　　　　There are other conditions listed.  There are 12

8　conditions, Mr. Lessley.  Have you reviewed --

9　　　　MR. LESSLEY:  Yes, we were reading them downstairs

10　before court.

11　　　　THE COURT:  And those are all the previous

12　conditions.  So there's nothing particularly new.

13　　　　I will see you on the 14th of May.

14　　　　Do you have any questions?  You know what the

15　expectations are?

16　　　　THE DEFENDANT:  Yes, I do, Your Honor.  Thank you.

17　　　　THE COURT:  Anything?

18　　　　PROBATION OFFICE MORALES:  Your Honor, just to be

19　clear, he's currently on probation.  He's not on supervised

20　release, so revoking his probation --

21　　　　THE COURT:  Oh, that's right.  I was sitting here

22　thinking that I -- thank you.  So -- thank you.  I will

23　clarify that.

24　　　　Your term of probation is revoked.  You are

25　committed to the custody of the Bureau of Prisons for the

09:52:26    1    time served considered served.

2                You showed that you are not capable of residing in

3        the community without proper assistance with your medication

4        and mental health requirements.

5                Therefore, the court finds that you violated your

6        terms of probation by failing to reside in a residential

7        reentry center for not more than 180 days and committing the

8        new law violations.

9                The court finds you are no longer suitable for

10       community supervision.

11               It's ordered, therefore, that your term of

12       probation is revoked, and you are committed to the Bureau of

13       Prisons for a period of time served considered served.

14               Upon release from your imprisonment, you are

15       subject to the terms of supervised release under 18 U.S.C.

16       § 3583, and that then sets out your period of supervision

17       for the next 36 months with the conditions that I have just

18       reviewed.

19               Okay?  Is that clear?  So your probation is

20       revoked --

21               THE DEFENDANT:  As clear as it could be.

22               THE COURT:  -- and now you are on supervised

23       release because you have been in custody a substantial

24       period of time.

25               Any questions that you have?

09:53:23

1    THE DEFENDANT:  No, Your Honor.

2    THE COURT:  And Mr. Lessley, you might make a

3    recommendation to your office about who should take this

4    case.  I hope you will do that.

5    MR. LESSLEY:  I will come up with one.  If I can

6    do it, that would be my plan.

7    THE COURT:  Okay.

8    MR. LESSLEY:  Well, I mean, in terms of after I

9    am?

10    THE COURT:  Pardon?

11    MR. LESSLEY:  I am not sure what Your Honor is

12    asking about.

13    THE COURT:  Just after -- whenever -- when you

14    have moved on, I just want to make sure he's reassigned to

15    someone who --

16    MR. LESSLEY:  I am -- I have not had a chance to

17    come and talk to Your Honor about my plans and had fully

18    intended to do that, but I am still going to be around.  I

19    am still going to be practicing, so my --

20    THE COURT:  Oh, excellent.

21    MR. LESSLEY:  Yeah, I am going to be practicing

22    with Tina.

23    THE COURT:  I thought you might be just doing

24    civil work, so.

25    MR. LESSLEY:  No.

09:54:10  1                    THE COURT:  Oh, excellent.

        2                    MR. LESSLEY:  I am going to be on the panel.

        3                    THE COURT:  Excellent.

        4                    MR. LESSLEY:  I will ask them to keep me on this.

        5                    THE COURT:  That's good news.

        6            All right.  You have 14 days in which to appeal

        7    the sentence in this case.  If you can't afford to do so,

        8    contact the clerk's office.  It will be done for you and

        9    done for free.

       10            I hope at some point you start to anticipate -- I

       11    don't know how to say this otherwise.  One of the things --

       12                    THE DEFENDANT:  I do.  I keep a journal.

       13                    THE COURT:  One of the things I have been

       14    incredibly working on for weeks is to have the ability to

       15    put a wristband that identifies -- it's all research done by

       16    Tel Aviv University that identifies in your phone and by the

       17    information it picks up when people start to go into

       18    episodic mental health issues.  Nobody seems to be --

       19                    THE DEFENDANT:  Increase of activity, more like

       20    double the paces today.  Warning.

       21                    THE COURT:  There is incredible research that lets

       22    people know there's something going on and we should

       23    intervene before something else happens.  It would be smart

       24    because it's inexpensive.  It would be smart for people to

       25    pick up and use it.

09:55:04  1          But, again, we'd rather lock people up in jail.

2          So you have 14 days, again, to appeal the sentence

3    in this case.  If you wish to do so, contact the clerk's

4    office.  It will be done for you and done for free.

5          THE DEFENDANT:  Thank you, Your Honor, and I will

6    find a Fitbit.

7          THE COURT:  Well, get something on and we'll talk

8    about it.  All right?  I just want you to be able to

9    anticipate and get ahead of some of your issues.

10          MR. BRUCE:  Thank you, Your Honor.

11          *(The proceedings were concluded this*

12          *11th day of April, 2018.)*

13

14

15

16

17

18

19

20

21

22

23

24

25

09:55:36

1        I hereby certify that the foregoing is a true and

2   correct transcript of the oral proceedings had in the

3   above-entitled matter, to the best of my skill and ability,

4   dated this 25th day of May, 2018.

5

6   /s/Kristi L. Anderson
    _____
7   Kristi L. Anderson, Certified Realtime Reporter

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25